UNITED STATES of America and James S. Mabrey, Special Agent of the Internal Revenue Service, Plaintiffs-Appellees,

v.

C. D. KASMIR and Jerry A. Candy, Defendants-Appellants.

No. 73-1973.

United States Court of Appeals, Fifth Circuit.

Aug. 21, 1974.

Cyril David Kasmir, pro se; Edward A. Copley, Jr., Robert E. Goodfriend, Dallas, Tex., for defendants-appellants.

Scott P. Crampton, Asst. Atty. Gen., Jeffrey D. Snow, Atty., Ernest J. Brown, Acting Chief, Meyer Rothwacks, Atty., Tax Div., Dept. of Justice, Washington, D. C., Frank D. McCown, U. S. Atty., Kenneth J. Mighell, Asst. U. S. Atty., Fort Worth, Tex., Robert E. Lindsay, John P. Burke, Attys., Tax Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before BELL, THORNBERRY and DYER, Circuit Judges.

THORNBERRY, Circuit Judge:

In United States v. White, 5th Cir. 1973, 477 F.2d 757, aff'd en banc, 487 F.2d 1335, we phrased the issue presented thusly:

. . . whether the constitutional privilege against compulsory self-incrimination may be invoked in behalf

of a taxpayer by his attorney to prevent the production of income tax workpapers in his attorney's possession . . .

That same issue is before us again, this time with a different factual background.

On January 3, 1973, the taxpayer, Dr. Mason, was visited in his office in Dallas, Texas, by two Special Agents of the Internal Revenue Service who informed Dr. Mason that his tax returns for the years 1969, 1970, and 1971 were under investigation and gave him *Miranda* warnings. During the visit, one of the Special Agents asked to see Dr. Mason's personal books and records. Mr. Mason complied with the request, but at the same time, he called his accountant Candy, who advised him not to show any of his records to the Agents. The doctor followed Candy's advice, withdrew the records on the desk, and concluded the interview.

Following Dr. Mason's call to Candy, Candy called Kasmir and informed him of the visit. At Candy's request, Kasmir called Dr. Mason that afternoon and was retained by the doctor as his attorney. Early the next morning, at the direction of his employer, Candy delivered an assortment of records and documents to Dr. Mason at the doctor's office, and simultaneously relinquished to the taxpayer "the rightful, indefinite and legitimate possession of" the materials. Within minutes of receiving the materials, the taxpayer turned them over to appellant Kasmir as his attorney.

The next day summonses were served on Candy and Kasmir, ordering the latter to give up the documents and the former to give testimony concerning them.[1] When neither appellant agreed

---

1. The following documents were summoned:
   1. Accountant's work papers pertaining to Dr. Mason's books and records of 1969, 1970, and 1971.
   2. Retained copies of Dr. Mason's income tax returns for 1969, 1970, and 1971.
   3. Retained copies of reports and other correspondence between [the accounting

firm] and Dr. Mason during 1969, 1970, and 1971.
The government did not seek the documents which Dr. Mason permitted the Agents to examine during their initial visit and admitted that those documents could be withheld by the doctor if he invoked a Fifth Amendment self-incrimination claim.

to comply with the summonses, the government sought enforcement. In a pre-*White* and pre-*Couch v. United States* hearing and order, the district court granted the government's petition on the grounds that the records were owned by the accounting firm and that at the time the summonses were served, the records were in Kasmir's possession. The district court stayed its order pending this appeal.

Appellants contend that in the circumstances of this case, (1) the taxpayer's attorney has standing to raise the taxpayer's constitutional right to be free from self-incrimination, (2) enforcement of the summons for the production of records violates the taxpayer's Self-Incrimination Privilege, and (3) enforcement of the summons for production of records should be denied because IRS agents materially misrepresented themselves before the taxpayer.

Following the procedure employed in *White*, we begin with appellants' second contention, for recognition of standing in the attorney would be of little comfort to appellants unless the attorney's client does have Fifth Amendment rights in the summoned materials. Appellants contend here, as the appellant did in *White*, that enforcement of the summons violates the taxpayer's privilege because possession of the records by the taxpayer's attorney constitutes constructive possession by the taxpayer. Initially faced with our en banc decision in *White* as a formidable wall to scale,

appellants have launched a methodical effort in order to disabuse us of the notion that *White* compels their defeat. They argue that the taxpayer doctor's actual possession of the summoned documents is a crucial factual distinction between this case and *White*. They see further significance in the fact that here the taxpayer turned the papers over to his attorney pursuant to their attorney-client relationship while in *White* the transfer of the documents was not from the client to the attorney but from the taxpayers' accountant to the attorney. Both parties agree that the question before this court is whether those factual differences warrant a result different from that reached in *White*.

The government attacks the appellants' position from two sides. First, the government argues that an accused may not object to summons of records owned by third parties even if in the accused's possession. The government's theory is that an accused cannot invoke the Fifth Amendment privilege against self-incrimination unless he both owns and possesses the documents in question. Second, the government contends that the taxpayer never had "rightful possession" of the papers because this enterprise by the appellants and the taxpayer was "a frantic last minute effort to put the requested records beyond the reach of a legitimate tax investigation" by "winning a footrace with agents of the government."

The summons was issued pursuant to 26 U.S.C. § 7602 (1964 ed.), which provides:

Examination of Books and Witnesses.

For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized

—

(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

(2) To summon the person liable for tax or required to perform the act, or any of-

ficer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry.

In the theatre of criminal tax investigations, few issues have been more hotly contested than the determination of the scope of the Fifth Amendment privilege against self-incrimination. Drawing heavily upon the historical evolution of the privilege, the Supreme Court in Couch v. United States, 1973, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548, has now spoken on the subject before us in a manner that guides our journey far down the road to judgment, but not to the very end. Lillian Couch was the sole proprietress of a restaurant who, since 1955, had given all of her financial records to an independent accountant for the purpose of preparing her income tax returns, although she retained title to the records. After a summons had been issued and served upon the accountant, the taxpayer instructed the accountant to deliver all of the sought-after documents directly to her attorney. In upholding enforcement of the summons against the accountant, the Supreme Court held that the taxpayer had no Fifth Amendment privilege in documents which she merely owned, which had been in the continuous possession of an independent accountant for over a decade, and with respect to which she could show no legitimate expectation of privacy.

The Court began its inquiry by quoting from Murphy v. Waterfront Comm'n of New York Harbor, 1964, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678, on the nature of the Self-Incrimination Privilege and the interests it was designed to protect. Writing for the Court in *Murphy*, Justice Goldberg offered this statement:

. . . It [the privilege] reflects many of our fundamental values and most noble aspirations: our unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates "a

fair state-individual balance by requiring the government to leave the individual alone until good cause is shown for disturbing him and by requiring the government in its contest with the individual to shoulder the entire load," 8 Wigmore, Evidence (McNaughton rev., 1961), 317; our respect for the inviolability of the human personality and of the right of each individual "to a private enclave where he may lead a private life," United States v. Grunewald, 2 Cir., 233 F.2d 556, 581–582 (Frank J., dissenting), rev'd 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; our distrust of self-deprecatory statements; and our realization that the privilege, while sometimes "a shelter to the guilty," is often "a protection to the innocent." Quinn v. United States, 349 U.S. 155, 162, 75 S.Ct. 668, 673, 99 L.Ed. 964.

. . .

*Id.*, 378 U.S. at 55, 84 S.Ct. at 1596–1597.

The *Couch* Court held that actual possession, rather than ownership, "bears the most significant relationship to Fifth Amendment protections against state compulsions upon the individual accused of crime." Couch v. United States, supra, 409 U.S. at 333, 93 S.Ct. at 618. But the Court was careful to note that "actual possession" is not necessarily the *sine qua non* for successful assertion of the Fifth Amendment privilege:

. . . Yet situations may well arise where constructive possession is so clear or the relinquishment of possession is so temporary and insignificant as to leave the personal compulsions upon the accused substantially intact . . .

*Id.* The Court explained further:

. . . We do indeed attach constitutional importance to possession, but only because of its close relationship to those personal compulsions and intrusions which the Fifth Amendment forbids . . . [W]e do not adopt any *per se* rule. We also decline to conjecture broadly on the significance

of possession in cases and circumstances not before this Court . . .

*Id.*, 409 U.S. at 336, 93 S.Ct. at 620 n. 20.

As a positive indication that lack of physical possession is not necessarily determinative, the Court did not stop with its conclusion that the papers were in the possession of the accountant, not the taxpayer, at the time the summons was served, but inquired further into the nature of the records sought by the summons and concluded that the taxpayer could show no legitimate expectation of privacy with regard to them because

. . . there can be little expectation of privacy where records are handed to an accountant, knowing that mandatory disclosure of much of the information therein is required in an income tax return. What information is not disclosed is largely in the accountant's discretion, not petitioner's. Indeed, the accountant himself risks criminal prosecution if he knowingly assists in the preparation of a false return . . . His own need for self-protection would often require the right to disclose the information given him. Petitioner seeks extensions of constitutional protections against self-incrimination in the very situation where obligations of disclosure exist and under a system largely dependent upon honest self-reporting even to survive. Accordingly, petitioner here cannot reasonably claim, . . ., an expectation of protected privacy or confidentiality.

*Id.*, 409 S.Ct. at 335, 93 S.Ct. at 619, 34 L.Ed.2d at 558. Thus the method adopted by the Court focuses the inquiry on two factors: (1) the party in possession of the evidence and (2) where the actual possessor is not the taxpayer, the taxpayer's legitimate expectation of privacy with regard to the evidence. By considering not only the question of physical, personal compulsion upon the accused, but also any expectation of privacy which might reasonably attach to the summoned materials, the Court was weighing the extent to which any of the variety of policies enumerated in *Murphy* would be furthered by application of the privilege. Indeed, in *Murphy*, the Court noted that "it will not do . . . to assign one isolated policy to the privilege," and on that basis to decide whether applying the privilege is in furtherance of "the" policy. Murphy v. Waterfront Comm'n of New York Harbor, supra, 378 U.S. at 56 n. 5, 84 S.Ct. at 1597 n. 5.

We had our first opportunity to apply the lesson of *Couch* only recently in United States v. White, supra, 477 F.2d 757, aff'd en banc, 487 F.2d 1335. After an IRS investigation had commenced but prior to the issuance of a summons, the taxpayers' accountant had turned over workpapers and other documents directly to the taxpayers' attorney White. A year later, a summons was served upon the attorney who resisted enforcement by asserting his client taxpayers' Fifth Amendment privilege. Since the taxpayers were obviously not in actual possession of the requested material, their only hope lay in their contention that they were in constructive possession through their attorney. Although the high court did not attempt to define that term in *Couch*, in writing for this court in *White*, Judge Gewin attempted to explicate the Supreme Court's thinking:

. . . As possible examples of such a case the Court cited Schwimmer v. United States and United States v. Guterma. In both of these cases a claim of privilege was successfully asserted to prevent the government from obtaining documents the parties had temporarily stored on the premises of corporations. The reference to these cases in *Couch* indicates that a claim of privilege might be valid on the constructive possession theory if the taxpayer has placed papers in the hands of another person or entity for custodial safekeeping, thereby retaining the right to immediate possession though not having actual possession . . .

United States v. White, supra, 477 F.2d at 763. Unfortunately for the taxpayers in *White*, they could not fall within that definition. The taxpayers had never been in actual possession of the papers sought by the government. The attorney had obtained the documents directly from the accountant without record evidence that he had done so upon the taxpayers' instructions or that they were even aware that he had secured them. The parties to the transfer, White and the accountant, had agreed that White —not the taxpayers—could keep the papers indefinitely, but that they would be returned to the accountant upon completion of White's work. Thus, the taxpayers retained no right to immediate possession; indeed they "retained" nothing. Their actions could not be said to have evinced any legitimate expectation of privacy. Under those circumstances, to have permitted the attorney to assert the taxpayers' privilege would have been inconsistent with the nature of the right against self-incrimination and with the interests it was designed to protect.

■ It is with this lengthy prelude that we finally meet appellants' and the government's contentions head-on. Our reading of *Couch* convinces us that there is no basis for adopting the government's position that ownership is a prerequisite to the assertion of the privilege. Indeed, the Court eschewed any reliance on ownership as an important factor. "To tie the privilege . . . to a concept of ownership would be to draw a meaningless line." Couch v. United States, supra, 409 U.S. at 331, 93 S.Ct. at 617. To agree with the government here would be not only to read *Couch* perversely, but also to ignore the historical elaboration of the Fifth Amendment privilege. We choose instead to adhere to the test enunciated

in *Couch*, a test which depends upon the policies and purposes of the privilege.[2]

The government's most appealing argument is that the taxpayer had no "rightful possession" here because this enterprise by the taxpayer, his accountant, and his attorney was "a frantic last minute effort to put the requested records beyond the reach of a legitimate tax investigation" by "winning a footrace with agents of the government." In spite of the argument's great superficial persuasiveness, we reject it.

In *Couch*, the Supreme Court refused to consider the fact that the documents sought were presently in the possession of the taxpayer's attorney because the transfer from accountant to attorney had occurred after the summons had been served on the accountant.

> . . . [C]onstitutional rights obviously cannot be enlarged by this kind of action. The rights and obligations of the parties became fixed when the summons was served, and the transfer did not alter them . . .

Couch v. United States, supra, 409 U.S. at 329, 93 S.Ct. at 616 n. 9, 34 L.Ed.2d at 554. But in the present case, the transfer of records occurred before the summons had been served. Indeed, the summons was issued and served the day following the taxpayer's possession.

■ The government would have this court hold that the rights and obligations of the parties become fixed when the Special Agent makes his first appearance and confronts the taxpayer with the unwelcome news that he is under investigation for criminal violations of the tax laws. But there is no support for that position in *Couch*; on the contrary, the Court has already made a choice which indicates disapproval of the government's position.[3] *See* United

---

2. Thus ownership might be a relevant factor to consider in determining a taxpayer's legitimate expectation of privacy with respect to summoned materials not in his possession, although that factor would not be dispositive.

3. The only reported opinion which appears to adopt the government's position is United States v. Widelski, 6th Cir. 1971, 452 F.2d 1, cert. denied, 1972, 406 U.S. 918, 92 S.Ct. 1769, 32 L.Ed.2d 117. But that opinion is nowhere cited in *Couch*. Instead the Court

States v. White, supra, 477 F.2d at 762 n. 12.

We fully agree with the government that a post-summons transfer of the documents is to be ignored in the determination of the applicability of the Fifth Amendment privilege. *Couch* demands no less. But the corollary proposition is that while the appellants and the taxpayer have in fact attempted to put the requested records beyond the reach of a tax investigation, that action is wholly proper as long as the transfer occurs before the summons is served. In our judgment, it would be highly improper and a serious derogation of the Fifth Amendment right if we were to test appellants' contention by asking whether they have attempted to keep evidence out of the hands of the investigators. For every successful claim of privilege frustrates to some extent the government's ability to gather evidence. In this context, the Fifth Amendment privilege demands that the government "shoulder the entire load" in its contest with the individual. Murphy v. Waterfront Comm'n of New York Harbor, supra; 8 Wigmore, Evidence (McNaughton rev., 1961) p. 317.

■■ But more importantly, and regardless of the timing of the transfers, appellants could not put the records beyond the reach of the IRS unless the material were properly the subject of a Fifth Amendment claim.[4] In this regard, some categorical statements can be made. Following *Couch*, it is clear that the taxpayer could assert no Fifth Amendment privilege in the records while they were held by his accountant. It is likewise clear from *Couch* that at the time the taxpayer obtained actual possession of the records, the day before the summons was served, he was in the position to assert his Fifth Amendment privilege, if the summons had then been served. Had he at that point followed Judge Gewin's analysis and placed the materials in a safe under his control, he could have successfully invoked the privilege by relying upon his constructive possession. *See* Schwimmer v. United States, 8th Cir. 1956, 232 F.2d 855; United States v. Guterma, 2nd Cir. 1959, 272 F.2d 344. Instead the taxpayer transfers the materials to his attorney for safekeeping and for the preparation of his defense.

We are thus faced with this dilemma: If we hold that no Fifth Amendment privilege is now available, then the taxpayer's rights have been effectively decreased by his transfer. In a sense, the taxpayer is better off without an attorney to study the records than with him. Indeed, we make it almost appear as though the taxpayer must now closet himself with his myriad tax data drawn up around him and permit the attorney to study or possess the records only when the taxpayer is in a position to grab them physically, lest some furtive and surreptitious agent may swoop down with a summons while the attorney is fingering the treasure. On the other hand, if we hold that the Fifth Amendment privilege is available here, then we make it appear as if the applicability of the privilege is more a matter of the form of the transfer than the substance behind the privilege since the most important difference between this case and *White* is taxpayer's fleeting actual possession between that of the accountant and that of the attorney.

But even dilemmas sometimes admit of sensible resolution, and in any case, decide we must. To make the correct choice, we return to the principles announced in *Couch* and *White*. In its

---

cited United States v. Zakutansky, 7th Cir. 1968, 401 F.2d 68, 72, cert. denied, 1969, 393 U.S. 1021, 89 S.Ct. 628, 21 L.Ed.2d 565, and United States v. Lyons, 1st Cir. 1971, 442 F.2d 1144, both of which held that constitutional rights may not be enlarged by a transfer of records which occurs after a summons is served.

4. The process for determining the incriminating character of evidence is plainly set forth in Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118. But the incriminating character of the materials sought here has not been put in issue.

most distilled form, the question is whether the taxpayer has a sufficient legitimate expectation of privacy in the summoned records to warrant the label of constructive possession. *Couch v. United States, supra,* 409 U.S. at 334–338, 93 S.Ct. at 619–620.

*Couch* held that a taxpayer could claim no legitimate expectation of privacy in records which he left with an accountant for the purpose of preparing the taxpayer's personal income tax returns. When the taxpayer in the present case received the records from his accountant, the taxpayer's physical possession became the "private enclave" which the Fifth Amendment privilege was designed to protect. It makes no difference that the taxpayer could claim no legitimate expectation of privacy when the records were held by the accountant, for it has not been suggested that a taxpayer in possession of records can be compelled to produce them because they have previously been used in preparing his own income tax return. For Fifth Amendment purposes, that the government can summon the documents from the accountant does not mean that those same documents can be summoned from the taxpayer. As the Ninth Circuit put it, "that the government-mean that those same documents can be without compelling [the taxpayer] to incriminate himself is hardly a justifica-tion for compelling [the taxpayer] to incriminate himself." *United States v. Cohen,* 9th Cir. 1967, 388 F.2d 464, 469; *see also Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319.

When the taxpayer subsequently transferred his records to his attorney pursuant to the attorney-cleint relationship, in our judgment he retained that legitimiate expectation of privacy or private enclave with respect to the records. We reject the notion, as we did in *White,* that a Fifth Amendment privilege in the taxpayer can somehow be *created* when evidence finds its way into his attorney's hands. *See also Falsone v. United States,* 5th Cir. 1953, 205 F.2d 734, 738. But we also reject the idea that a taxpayer's right to be free from self-incrimination can be *decreased* or defeated by the taxpayer's transfer of records to his attorney pursuant to the attorney-client relationship.[5]

In *White,* in order to permit assertion of the privilege, we would have had to recognize that the transfer from the accountant to the attorney *created* a right in the taxpayer where none existed before. And in *Couch,* the taxpayer gave up the Amendment's protection when she gave her records to her accountant for the purpose of preparing tax returns and never regained the protection before

5. 8 Wigmore, Evidence (McNaughton rev., 1961) § 2307:

"Is the attorney compellable to *produce in court,* by subpoena or bill of discovery, the documents placed in his possession by the client?

\* \* \* \* \*

"The answer here depends upon the other privileges of the client *irrespective of* [the attorney-client privilege]. The attorney is but the agent of the client to hold the deed. If the client is compellable to give up possession, then the attorney is; if the client is not, then the attorney is not. It is merely a question of possession, and the attorney in this respect is like any other agent. There is, to be sure, the added consideration of policy—namely, that if the attorney were not compellable when the client was, then the client's obligation to produce could always be evaded in very simple fashion by placing the deed with the attorney.

\* \* \* \* \*

"It follows, then, that *when the client himself would be privileged* from protection of the document . . . as exempt from self-incrimination, the attorney having possession of the document is not bound to produce. Such has invariably been the ruling. On the *other* hand, if the *client would be compellable* to produce . . . then the attorney is equally compellable, if the document is in his custody, to produce under the appropriate procedure." (Emphasis in original.)

*See also United States v. Judson,* 9th Cir. 1963, 322 F.2d 460, 466: "The government would have us hold that the taxpayer walked into his attorney's office unquestionably shielded with the Amendment's protection, and walked out with something less."

the materials were summoned. Quite aside from the fact that the attorney in *Couch* came into possession of the records after the summons had been served and thus after all rights and obligations had vested, to have allowed assertion of the privilege there would have been to *create* rather than *retain* a privilege in the taxpayer. Neither the Supreme Court nor this court could approve such a result.

■■■ But where the taxpayer transfers potentially incriminating materials which he physically possesses to his attorney pursuant to an attorney-client relationship, the taxpayer's legitimate expectation of privacy with regard to the use of the materials should be quite different from his legitimate expectations as to its use in the hands of an independent accountant preparing tax returns. While the accountant has a legal duty to disclose, the attorney has a strict, ethical obligation to prevent disclosure. This ethical obligation is broader than and independent of the attorney-client privilege,[6] which is admittedly not available here. The Disciplinary Rules of the Code of Professional Responsibility prepared by the American Bar Association absolutely forbid an attorney from knowingly revealing either a "confidence" or a "secret" of his client. A "confidence" refers to information protected by the attorney-client privilege while a "secret" refers to any other information "gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." ABA Code of Professional Responsibility, DR 4-101(A), (B)(1). Of course, the taxpayer cannot assert the attorney-client *relationship*, as distinguished from the attorney-client privilege, as a basis for denying enforcement

of the summons. But even where there is no attorney-client *privilege* in certain material, as here, the taxpayer client may still have a legitimate expectation of privacy with regard to that material because of the attorney-client relationship, an expectation of privacy which helps to give substance to a Fifth Amendment privilege contention.

■■■ Stripped of any constitutional perspective, the factual differences between this case and *White* may seem insignificant. But we find constitutional significance both in the actual possession by the taxpayer before the summons was served and in the transfer from the taxpayer to the attorney pursuant to the attorney-client relationship. We conclude that the taxpayer here retained a legitimate expectation of privacy with regard to the materials he placed in his attorney's custody, that he retained constructive possession of the evidence, and thus that he retained Fifth Amendment protection. As a matter of constitutional law, we can see no other way to resolve the apparent dilemma in a manner which is consistent with the nature of the right against self-incrimination and in furtherance of the interests it was designed to protect.

We are convinced that our result is consistent with the policies and purposes of the Self-Incrimination Privilege in spite of the government's contention that the taxpayer's evanescent possession is wholly inadequate to raise the privilege. If the taxpayer had possessed the papers for only one more day, when the summons was served, he could have successfully asserted the privilege. The government has not suggested a method by which we could distinguish the taxpayer's possession here from something more permanent. Nor has the government offered any reason why we should compel the taxpayer to hold onto the

---

6. The ABA Code of Professional Responsibility, Ethical Consideration 4-4 provides in part:

"The *attorney-client privilege* is more limited than the ethical obligation of a lawyer to guard the confidences and se-

crets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge."

documents for a particular period of time. In our judgment, the taxpayer's short-lived possession was sufficient to permit a claim based on the Self-Incrimination Privilege, and the subsequent transfer to his attorney evidenced a sufficient legitimate expectation of privacy to permit the taxpayer to retain the Amendment's protection through constructive possession.

■■■ This does not end the matter, however, for we must now answer the question which we left unanswered in *White*: whether the taxpayer's attorney has standing to assert the taxpayer's claim of privilege. If he does not, then the district court's order is to be affirmed, because the taxpayer has not intervened in his own behalf. Although there is no unanimity among the courts in their answers to the question posed, in our judgment the weight of authority and reason supports the position that an attorney may claim the Self-Incrimination Privilege on behalf of his client if his client could have successfully asserted such a privilege. United States v. Judson, 9th Cir. 1963, 322 F.2d 460, 463–465; Colton v. United States, 2nd Cir. 1962, 306 F.2d 633, 639, cert. denied, 1963, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499; Brody v. United States, 1st Cir. 1957, 243 F.2d 378, 387 n. 5, cert. denied, 354 U.S. 923, 77 S.Ct. 1384, 1 L.Ed.2d 1438; 8 Wigmore, Evidence § 2307 (McNaughton rev., 1961); Grant v. United States, 1913, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423; Application of House, N.D.Cal.1956, 144 F.Supp. 95; *but cf.*, Bouschor v. United States, 8th Cir. 1963, 316 F.2d 451, 458–459. As the Ninth Circuit explained in United States v. Judson, supra, the realities of tax litigation require that the attorney be allowed to press his client's claim where the client could successfully do so:

. . . No other "third party," nor "agent," nor "representative" stands in such a unique relationship between the accused and the judicial process as does his attorney. He is the only person besides the client himself who is permitted to prepare and conduct the defense of the matter under investigation. The attorney and his client are so identical with respect to the function of the evidence and to the proceedings which call for its production that any distinction is mere sophistry . . .

United States v. Judson, supra, 322 F.2d at 467. While there may be good reason to permit the taxpayer to intervene and to encourage the taxpayer to do so, we see no reason to require that procedure.

■■■ Thus the IRS is not entitled to enforcement of the summons directed to attorney Kasmir for the production of documents. However, in light of *Couch* the IRS is entitled to enforcement of the summons served upon accountant Candy for his testimony concerning the sought-after documents. Whether, as a practical matter, enforcement of this summons is of any benefit to the government in its investigation is purely a matter for the IRS to consider. As a constitutional matter, the accountant's testimony cannot offend the taxpayer's Self-Incrimination Privilege. Couch v. United States, supra.

The result which we reach here does not make us any less mindful of the overriding necessity of collecting the tax revenues. At the same time, we must also remember that the investigative power of the Internal Revenue Service is fundamentally inquisitorial, that the government's power lies not in the fashion of the Courts of the Star Chamber and the High Commission,[7] but in its ability to invade, in a civilized manner, the personality and privacy of every citizen in the United States.

When the Constitution was first ratified, the citizens of this country were

---

7. Whose only limitation was that whatever torture might be applied, it could not be such as to draw blood from the victim. Hence the popularity of the rack. *See* 40 Brooklyn L.Rev. 211, 213 n. 10 (1973); *see also* L. Levy, Origins of the Fifth Amendment: The Right Against Self-Incrimination (1968).

not yet dependent upon attorneys to decipher complex tax laws. And at that time, the specter of the more brutal forms of compulsory self-incrimination was all that required concern. Today, however, the government's power can be used to stimulate a taxpayer's dependence upon his attorney and the predictable transfer of his records. Once so transferred, the government argues, the materials are subject to compelled disclosure. In our judgment, the inherent power thus to compel indirectly an individual's self-incrimination is curbed by the Fifth Amendment as effectively as the power to compel the same result directly. United States v. Judson, supra, 322 F.2d at 468. The policies and purposes of the Self-Incrimination Privilege do not change merely because new techniques or devices for compulsion have replaced the old. Put another way, we must never forget that it is a constitution we are expounding. M'Culloch v. Maryland, 1819, 4 Wheat. 316, 407, 4 L. Ed. 579, 601.[8]

Affirmed in part, reversed in part.

BELL, Circuit Judge (dissenting):
I respectfully dissent.

The operative facts here are:

(1) The records sought to be produced are owned by the accountant and not taxpayer (the records had to do with taxpayer's tax returns). The government did not seek the production of records owned by taxpayer.

(2) When the taxpayer telephoned the accountant to say that the agents were in his office, the accountant advised taxpayer to say nothing and not to produce his records.

(3) The accountant then selected a lawyer for taxpayer, took the records in question (the accountant's records), to the taxpayer's office early the next morning, where he handed them to taxpayer who, in turn, handed them to the lawyer.

I dissent for two reasons. First, taxpayer can take no comfort in the activity of the accountant and lawyer. Without venturing into a dissertation on situation ethics, I am satisfied to say that lawyers and accountants have a higher call to duty than that of acting to prevent the production of evidence through the use of a privilege under the circumstances here. The privilege is designed to protect a client's confidence imparted during the attorney-client relationship.

The privilege does not exist, however, for the purpose of being used initially and directly as a stratagem or device to place pre-existing documentary evidence beyond the reach of the law. While conceding this, the majority in the same breath uses the attorney-client relationship in a futile effort to establish an expectation of privacy to satisfy one of the requirements of Couch v. United States, 1973, 409 U.S. 322, 93 S.Ct. 611, 34 L. Ed.2d 548.

In *Couch*, a taxpayer was not allowed the Fifth Amendment privilege against self-incrimination even as to her own records in the hands of her accountant. The court stated that the two essential bases for the privilege were absent: no legitimate expectation of personal privacy in the records, and no governmental compulsion against the person of the taxpayer.

Where is taxpayer's expectation of personal privacy in the accountant's records here? What compulsion is there against the person of the taxpayer in a summons against his lawyer to produce an accountant's records which were for a fleeting moment placed in the hands of the taxpayer by the accountant. An expectation of personal privacy of the *Couch* type cannot be generated *ipso facto* by creating a lawyer-client relationship. I would therefore pretermit further consideration of the element of compulsion.

Moreover, it would appear that the majority opinion may conflict with our decision in United States v. White, 5 Cir., 1973, 477 F.2d 757, aff'd en banc, 487 F.2d 1335. The only possible differ-

8. Because of our disposition of this appeal, we need not consider appellants' final contention.

ence between this case and *White* is that the accountant's records in *White*, reflecting, as here, the affairs of the taxpayer, were transferred directly from the accountant to the lawyer. We held that there was no Fifth Amendment privilege to be exercised for the taxpayer by his lawyer in the accountant's records.

I did not join in *White* on the narrow basis of exalting form over substance to the extent of reserving a different holding for a set of facts where the same records had passed through the hands of the taxpayer.

For the reasons stated I would affirm the district court to the end of enforcing the summons.