**In re Grand Jury Appearance of Alvin S. MICHAELSON, Esquire.**

No. 74–3409.

United States Court of Appeals, Ninth Circuit.

Jan. 22, 1975.

Certiorari Denied May 19, 1975.

See 95 S.Ct. 1979.

Barry Tarlow (argued), Los Angeles, Cal., for appellant.

James T. Duff, Sp. Atty., Dept. of Justice (argued), Reno, Nev., for appellee.

Before BARNES, MERRILL and DUNIWAY, Circuit Judges.

## OPINION

BARNES, Circuit Judge:

### I. *Prior Proceedings*

This is an appeal from an order of the district court dated December 5, 1974, adjudging appellant, an attorney, in civil contempt and ordering him confined due to his refusal to answer questions before a grand jury after immunity had been granted to him and to his client under § 201(a) of the Organized Crime Control Act of 1970, 18 U.S.C. § 6002 et seq. Appellant is presently at liberty on bail.

The contempt order was entered pursuant to § 301(a) of the aforementioned Act, 28 U.S.C. § 1826.

In that 28 U.S.C. § 1826 requires that an appeal taken from such a contempt order be disposed of by this Court not later than 30 days from its filing (in the instant case, by Monday, January 6th, 1975 (January 4th being a Saturday), *see* Rule 6(a) Federal Rules of Civil Procedure), this panel on January 6th, 1975 filed an unpublished per curiam memorandum affirming the order of the district court. Judges Barnes and Duniway joined in that memorandum and Judge Merrill reserved the right to file a dissent when the full opinion is published.

In addition to our affirmance of the district court's order, our memorandum of January 6th held:

"Due to the time limitations imposed upon us by § 1826, this Court cannot consider any petitions for rehearing or consideration *en banc*, and no such petitions will be entertained. *See* Charleston v. United States, 444 F.2d 504 (9th Cir. 1971); Bacon v. United States, 446 F.2d 667 (9th Cir. 1971).

"This case will be remanded forthwith to the district court to revoke bail and order Mr. Michaelson into confinement.

"However, as counsel for appellant has suggested to us, that in the event of affirmance they may apply for a writ of certiorari, issuance of the mandate is stayed thirty days to enable appellant to apply for a writ of certiorari. If a timely application for such a writ is filed, the stay shall remain in effect until the application has been denied, or, if granted, until the cause has been determined by the Supreme Court. Weg v. United States, 450 F.2d 340 (9th Cir. 1971); *Bacon, supra* [446 F.2d] at 669; *Charleston, supra* [444 F.2d] at 506."

Our memorandum also bore a notation that an opinion setting forth in greater detail our reasons for affirmance would be issued in due course as has been the practice of this Circuit. *See* Stewart v. United States, 440 F.2d 954 (9th Cir. 1971), aff'd sub nom., Kastigar v. United

States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

This now is that opinion.

## II. Statement of Facts

Alvin S. Michaelson, Esq., an attorney at law, appeals from an order made by the Honorable Bruce R. Thompson, a district judge of the District of Nevada, dated December 5th, 1974, holding said Michaelson in civil contempt of court for his wilful disobedience of a previous order of the same court, dated October 17, 1974, which denied Michaelson's motion to quash his subpoena, and ordered said Michaelson to give testimony before a United States Grand Jury "respecting unprivileged communications with his client, Brenda Marie Sibson." [1]

This was after Miss Sibson had been granted use immunity under 18 U.S.C. § 6002 et seq., when she refused to answer certain questions before the same grand jury.

Michaelson appeared before the grand jury on December 4th, 1974, and refused to answer certain questions propounded by government counsel.

Later on that same day, Michaelson was taken before Judge Thompson who ordered that the secrecy of the grand jury proceedings be lifted, insofar as the testimony of Mr. Michaelson was concerned. Such testimony, read by the grand jury short-hand reporter, disclosed the following questions had been asked of Mr. Michaelson after he had been advised of the nature of the grand jury inquiry, and had known he had been ordered "to give testimony concerning certain fee arrangements between [himself] and Miss Brenda Sibson, and [was] to testify to those matters and any matters, which [were] not subject to the attorney-client privilege." (R.T. Vol. IV, p. 11, line 14 to p. 12, line 7).

The questions which Mr. Michaelson refused to answer and which he was ordered to answer, were these (R.T. Vol. III, pp. 8–9):

1. Q. Did anyone refer Miss Sibson to you?

---

[1] In the United States District Court for the District of Nevada

Misc. No. R–74–43 BRT

In re:
Grand Jury Appearance of Alvin S. Michaelson, Esquire.

[Received and Filed Oct. 17, 1974]

ORDER

Alvin S. Michaelson, an attorney, has moved to quash a grand jury subpoena upon the ground that the anticipated questions will violate the attorney-client privilege.

"In the absence of unusual circumstances, the fact of a retainer, the identity of the client, the conditions of employment and the amount of the fee do not come within the privilege of the attorney-client relationship." In re Semel, 411 F.2d 195 (3rd Cir. 1969). This is also true with respect to who paid the fee, if any. United States v. Pape, 144 F.2d 778 (2nd Cir. 1944). The Pape case is instructive because of the dissent by Judge Learned Hand. Unlike Pape, Michaelson's affidavit in the instant case makes no claim that disclosure would violate a confidential communication from any client other than Brenda Sibson. In the affidavit, Michaelson alludes to conversations "between Brenda Marie Sibson, myself and/or her agents," but obviously, if the subject matter is not privileged as to Sibson, the client, it is not privileged in communications with the client's agents.

The allusion to possible jeopardy because of a false affidavit under the Criminal Justice Act is a red herring. Sibson has been granted immunity from prosecution under 18 U.S.C. § 6002, et seq, and has been interrogated with respect to the subject matter of Michaelson's proposed testimony. The Fifth Amendment privilege is personal and cannot be asserted by Michaelson for the protection of Sibson. Accordingly,

It Hereby Is Ordered that the motion to quash the grand jury subpoena is hereby denied and Alvin S. Michaelson, Esq. is hereby ordered to appear before the United States Grand Jury at Reno, Nevada at 9:30 o'clock a. m. on October 24, 1974, then and there to give testimony respecting unprivileged communications with his client, Brenda Marie Sibson, as indicated in the foregoing discussion.

Dated: October 17, 1974.

/s/ Bruce R. Thompson
United States District Judge

2. Q. Did you discuss a fee arrangement with Miss Sibson?

3. Q. Did any other individual besides Miss Sibson ever discuss with you a fee arrangement for your representation of Miss Sibson?

4. Q. What is your fee arrangement with Miss Sibson?

5. Q. How much money have you received from Miss Sibson?

6. Q. Have you received any money from any other person besides Miss Sibson to represent. Miss Sibson?

7. Q. Have you received any funds from Miss Sibson?

8. Q. Have you made arrangements with Miss Sibson to pay your expenses?

9. Q. Have you made an arrangement with any other person besides Miss Sibson for the payment of your expenses to represent her?[2]

Judge Thompson rejected appellant's counsel's arguments that the information sought to be elicited by the questions was privileged under any of the grounds which appellant asserts, granted Michaelson use immunity, and again ordered him to answer the questions.

On December 5th, 1974, Mr. Michaelson again refused to answer the same questions; and Judge Thompson thereupon held Mr. Michaelson in contempt, and pursuant to the provisions of 28 U.S.C. § 1826 ordered him confined until

he answered the questions, or until the term of the grand jury had expired. (C.T. 40–41). Mr. Michaelson filed this appeal, and was thereafter released on bail.

We first note that no objection was made to the form of the questions, or to their relevance to the grand jury investigation.

The sole question then before us is whether the information sought is privileged. Judge Thompson held it was not.

Mr. Michaelson urges that the information sought is privileged under one or more of the following reasons:

1. The First Amendment right of freedom of association.

2. The Fourth Amendment right of privacy.

3. The Fifth Amendment, raised on behalf of Miss Sibson. [3]

4. The Sixth Amendment right to effective counsel (alleging that forcing him to answer to the above questions would have a "chilling effect" on the attorney-client relationship).

5. The American Bar Association Code of Professional Responsibility.

6. The State of California Business and Professions Code, § 6068(e) and (h).

7. People v. Canfield, 12 Cal.3d 699, 117 Cal.Rptr. 81, 527 P.2d 633 (1974).

8. The attorney-client privilege.

---

**2.** The precise answer given to question 9 was this:

"A. I'm not going to answer that question on the grounds that I've indicated before. And for the record those grounds . . . [are] the First Amendment, the Fourth Amendment, the Fifth Amendment on behalf of my client, the Sixth Amendment, the Canons of Ethics of the American Bar Association, the attorney-client privilege, and the Canons of Ethics as indicated in California Business and Professions Code 606 E relating to my duties as an attorney as a member of the Bar of the State of California." (R.T., Vol. III, pp. 9–10).

**3.** Appellant does not assert the Fifth Amendment on his own behalf:

"Q. Then specifically you're invoking the First Amendment to the Constitution,

the Fourth Amendment to the Constitution, your Fifth Amendment privilege—

A. As it relates to Miss Sibson.

Q. Her Fifth Amendment privilege?

A. Yes, on behalf of her I'm asserting it, that's correct.

Q. Are you invoking your own Fifth Amendment privilege?

A. I believe I cannot do that.

Q. I just asked you yes or no whether you were.

A. I can't answer it that way.

Q. A simple yes or no. Are you refusing to answer on the grounds it may tend to incriminate you?

A. Oh, no, absolutely not." (R.T. Vol. III, p. 7 lines 9–23).

III. *Appellant's claims of privilege lack merit*

Several of Mr. Michaelson's positions are answered adversely to him by this Court's decision in United States v. Cromer, 483 F.2d 99 (9th Cir. 1973):

"Cromer [an attorney] next claims that he need not respond to the summons due to the attorney-client privilege. The summons in question required Cromer to testify as to the amounts owed to him by Bell and Brooks [Cromer's clients] on certain dates, the identification of payments by case file name, the general purpose of the legal work and whether it was performed for Brooks or Bell.

"[6, 7] The nature and existence of the privilege are determined by Nevada law. Baird v. Koerner, 279 F.2d 623, 632 (9th Cir. 1960). The applicable Nevada statute [5] is of recent origin and we are left without guidance from Nevada courts. However, the term 'confidential' has been statutorily defined:

'A communication is "confidential" if it is not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication.'

"Nev.Rev.Stat. § 49.055. We fail to see how the specific information requested can be considered a confidential communication. *See* Colton v. United States, 306 F.2d 633, 637–638 (2nd Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); C. McCormick, Evidence § 90 (2d ed. 1972).

"[8] Finally, Cromer attempts to raise Fourth and Fifth Amendment

claims for his clients as well as himself. Even if he could raise the rights of Bell and Brooks, neither could prevent the sought-after testimony of Cromer. *See* Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973); DeMasters v. Arend, 313 F.2d 79, 85 (9th Cir.), appeal dismissed per stipulation, 375 U.S. 936, 84 S.Ct. 341, 11 L.Ed.2d 269 (1963).

"[9] Equally unmeritorious is his claim that enforcement of this summons would violate his own Fourth and Fifth Amendment rights. Cromer does not demonstrate, as he must, how, as a result of revealing the answers to the specific questions that he has been ordered to answer, there will be a violation of his rights. His speculation and conjecture are insufficient. 'It is well established that the privilege protects against real dangers, not remote and speculative possibilities.' Zicarelli v. New Jersey State Comm'n of Investigation, 406 U.S. 472, 92 S.Ct. 1670, 1675, 32 L.Ed.2d 234 (1972); Hoffman v. United States, 341 U.S. 479, 486–487, 71 S.Ct. 814, 95 L.Ed. 1118 (1951)." (Id. at 101–102)

We observe that in *Cromer*, this Court, relying on Colton v. United States, 306 F.2d 633, 638 (2d Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963) (as well as McCormick on Evidence § 90 (2d Ed. 1972)), summarily disposed of one primary issue raised in the instant case in stating it: "fail[ed] to see how the specific information requested can be considered a confidential communication," as that language is used in the Nevada law. *Cromer* is the law of this Circuit.

In Colton, the Second Circuit said that certain legal advice given by attorneys is *"prima facie* subject to the attorney-client privilege," but

5. (In United States v. Cromer, *supra.*)

"5 Nev.Rev.Stat. § 49.095 provides:
"A client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications:
"1. Between himself or his representative and his lawyer or his lawyer's representative.

"2. Between his lawyer and the lawyer's representative.
"3. Made for the purpose of facilitating the rendition of professional legal services to the client, by him or his lawyer to a lawyer representing another in a matter of common interest."

" . . . the authorities are clear that the [attorney-client] privilege extends essentially only to the substance of matters communicated to an attorney in professional confidence. Thus the identity of a client, or the fact that a given individual has become a client are matters which an attorney normally may not refuse to disclose, even though the fact of having retained counsel may be used as evidence against the client. United States v. Pape, 144 F.2d 778 (2nd Cir.), cert. denied, 323 U.S. 752, 65 S.Ct. 86, 89 L.Ed. 602 (1944); Behrens v. Hironimus, 170 F.2d 627 (4th Cir. 1958); Goddard v. United States, 131 F.2d 220 (5 Cir. 1942); People ex rel. Vogelstein v. Warden, 150 Misc. 714, 270 N.Y.S. 362 (Sup.Ct.1934), aff'd mem. 242 App. Div. 611, 271 N.Y.S. 1059 (1st Dept. 1934); 8 Wigmore, Evidence § 2313 (McNaughton rev. 1961); McCormick, Evidence § 94 (1954). To be sure, there may be circumstances under which the identification of a client may amount to the prejudicial disclosure of a confidential communication, as where the substance of a disclosure has already been revealed but not its source. See, e. g., In re Kaplan, 8 N.Y.2d 214, 203 N.Y.S.2d 836, 168 N.E.2d 660 (1960); Baird v. Koerner, 279 F.2d 623 (9 Cir. 1960).

"We find, however, no such special circumstances in the case at bar. Nor was the permissible inquiry in this regard ended when Colton stated that the Matters were his clients and had been for some time. The principle that permits inquiry into the existence of a professional relationship obviously also permits questioning as to the years during which the relationship has continued. Thus, under the accepted doctrine, there was no basis for Colton's refusal to answer Questions 52 and 54.

■ For similar reasons there was no basis for Colton's refusal to state, in answer to Question 55, whether he had received any remuneration from the Matters for legal services rendered during the years 1954 through 1957."

The cases relied upon by Judge Thompson are mentioned in his order. They all establish that "In the absence of unusual circumstances, the fact of a retainer, the identity of the client, the conditions of employment and the amount of the fee and who paid it do not come within the privilege of attorney-client relationship." In re Semel, 411 F.2d 195 at 197 (3rd Cir. 1969), cert. denied, 396 U.S. 905, 90 S.Ct. 220, 24 L.Ed.2d 181 (1969); United States v. Pape, 144 F.2d 778, 782–783 (2nd Cir. 1944); Colton v. United States, 306 F.2d 633 (2nd Cir. 1962), cert. denied, 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963); United States v. Cromer, 483 F.2d 99 (9th Cir. 1973); Wirtz v. Fowler, 372 F.2d 315, 332–333 (5th Cir. 1966); Mauch v. CIR, 113 F.2d 555 (3rd Cir. 1940); In re Wasserman, 198 F.Supp. 564 (D.D.C. 1961).

■ Thus it has generally been held that information concerning the fee arrangement between an attorney and his client, or the existence of the attorney-client relationship is not privileged or protected by the attorney-client privilege. An exception is made for cases where the existence of the attorney-client relationship might be incriminating to a client (as in Baird v. Koerner, supra, or, as where an attorney returns a murder weapon to the police). This is not such a case. We also note that even this exception would not apply where the proper immunities are granted.

■ There are strong policy reasons why the existence of an attorney-client relationship, including the fee arrangement, should not be privileged absent incriminating circumstances such as outlined above. The courts have inherent power to regulate the bar. The courts have the right to inquire into fee arrangements both to protect the client from excessive fees and to assist an attorney in collection of his fee, but more importantly, the court may inquire into fee arrangements to protect against suspected conflicts of interest. When an attorney is paid by someone other than his client to represent that client there is

a real and present danger that the attorney may in actuality be representing not the interests of his client, but those of his compensator. Not only does the client have a right to know who is paying his attorney, but the court retains the right to satisfy itself that no conflict exists and that the attorney is fulfilling his duty of loyalty to his client.]

For two reasons we find no merit in appellant's assertion of a Fifth Amendment defense on behalf of his client.

First, the Fifth Amendment privilege is personal. Appellant's arguments and the facts of this case do not satisfy either of the two requirements for the assertion of a Fourth or Fifth Amendment privilege which were identified by the Supreme Court in Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). The fee information requested in this instance is not a privileged professional communication between lawyer and client in which the client has a legitimate expectation of privacy. Furthermore, the compulsion of this contempt order is directed not at compelling Miss Sibson to testify, but rather against Mr. Michaelson. As the court in *Couch* said:

"The criterion for Fifth Amendment immunity remains not the ownership of property but the ' "physical or moral compulsion" exerted.' *Perlman* [v. United States], 247 U.S. [7] at 15, 38 S.Ct. [417] at 420 [62 L.Ed. 950]. We hold today that no Fourth or Fifth Amendment claim can prevail where, as in this case, there exists no legitimate expectation of privacy and no semblance of governmental compulsion against the person of the accused.

\* \* \* \* \* \*

[It is important to reiterate that the Fifth Amendment privilege is a *personal* privilege: it adheres basically to the person, not to information that may incriminate him.] As Mr. Justice Holmes put it: 'A party is privileged from producing the evidence but not from its production.' Johnson v. Unit-

ed States, 228 U.S. 457, 458 [, 33 S.Ct. 572, 57 L.Ed. 919] (1913). The Constitution explicitly prohibits compelling an accused to bear witness 'against himself'; it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege, and 'prohibition of compelling a man . . . to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from *him*,' Holt v. United States, 218 U.S. 245, 252–253 [31 S.Ct. 2, 54 L.Ed. 1021] (1910) (emphasis added). It is extortion of information from the accused himself that offends our sense of justice.

"In the case before us the ingredient of personal compulsion against an accused is lacking. The summons and the order of the District Court enforcing it are directed against the accountant. He, not the taxpayer, is the only one compelled to do anything. And the accountant makes no claim that he may tend to be incriminated by the production. Inquisitorial pressure or coercion against a potentially accused person, compelling her, against her will, to utter self-condemning words or produce incriminating documents is absent. In the present case, no 'shadow of testimonial compulsion upon or enforced communication by the accused' is involved. Schmerber v. California, 384 U.S. 757, 765 [86 S.Ct. 1826, 1832, 16 L.Ed.2d 908] (1966)" (Id. at 336, 328–329, 93 S.Ct. at 616, 619).

Secondly, no Fifth Amendment privilege can be here asserted since both Mr. Michaelson and Miss Sibson were granted use immunity prior to Michaelson being instructed to answer the questions. Transactional immunity would afford a broader protection than the Fifth Amendment privilege, but

"immunity from use and derivative use is co-extensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the

890

privilege. While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need not be broader." Kastigar, et al. v. United States, 406 U.S. 441 at 453, 92 S.Ct. 1653, at 1661, 32 L.Ed.2d 212 (1972).

In arguing that he may assert a Fifth Amendment privilege on behalf of his client, appellant primarily relies upon United States v. Kasmir, 499 F.2d 444 (5th Cir. 1974) and United States v. Judson, 322 F.2d 460 (9th Cir. 1963). *Judson* is pre-*Couch* and pre-*Kastigar*, and prior to the use immunity statute enactment in 1970; and in neither *Kasmir* nor *Judson* had immunity been granted.

*Judson*, by its own language, is not here controlling. True, Mr. Judson, an attorney, claimed to raise the Fifth Amendment privilege on behalf of his clients, the Stachers.

It was undisputed that the negotiable instruments in commerce (checks and bank statements) delivered to the attorney Judson, "were never confidential from the time of their creation" (i. e., the attorney-client privilege did not apply to them). The Fifth Amendment was not invoked by the Stachers, but the items were noncompellable, if an attempt were made to have the Stachers produce them and they asserted their Fifth Amendment privilege. At issue in the *Judson* case is the effective exercise of the [Fifth Amendment] privilege "by one who is clearly entitled to its protection," meaning the taxpayers, Joseph and Miriam Stacher (*Id.* at 463).

But here, neither Michaelson nor Miss Sibson is entitled to such Fifth Amendment privilege because of the use immunity previously granted each of them.

The court in *Judson* draws the distinction between cases in which the client *could* assert a Fifth Amendment claim on his own behalf, and those cases in which he was barred from so doing by waiver, or some other disability, whereby "the client himself could not have raised the privilege."

Even assuming that *Judson* retains any viability since the Supreme Court's decision in *Couch,* appellant does not come within the confines of the *Judson* rule. In the instant case, Miss Sibson *cannot* assert a Fifth Amendment claim on her own behalf because she has been granted use immunity. Applying the *Judson* rule then, Michaelson cannot assert the Fifth Amendment on her behalf.

The second case heavily relied upon by appellant is United States v. Kasmir, 499 F.2d 444 (5th Cir. 1974). In *Kasmir,* the court observed:

"Following *Couch,* it is clear that the taxpayer could assert no Fifth Amendment privilege in the records while they were held by his accountant. It is likewise clear from *Couch* that at the time the taxpayer obtained actual possession of the records, the day before the summons was served, he was in the position to assert his Fifth Amendment privilege, if the summons had then been served. Had he at that point followed Judge Gewin's analysis and placed the materials in a safe under his control, he could have successfully invoked the privilege by relying upon his constructive possession. *See* Schwimmer v. United States, 8th Cir. 1956, 232 F.2d 855; United States v. Guterma, 2nd Cir. 1959, 272 F.2d 344. Instead the taxpayer transfers the materials to his attorney for safekeeping and for the preparation of his defense.

"We are thus faced with this dilemma: If we hold that no Fifth Amendment privilege is now available, then the taxpayer's rights have been effectively decreased by his transfer. In a sense, the taxpayer is better off without an attorney to study the records than with him." (*Id.* at 451).

To solve the dilemma, the *Kasmir* majority chose to rely on deciding "whether the taxpayer has a sufficient legitimate expectation of privacy in the summoned records to warrant the label of constructive possession" (which had been denied in *Couch, supra,* 409 U.S. at 334–338, 93 S.Ct. 611, to a taxpayer who left his records with an accountant). *Kasmir* rejects "the idea that a taxpayer's right to

891

be free from self-incrimination can be *decreased* or defeated by the taxpayer's transfer of records to his attorney pursuant to the attorney-client relationship." (*Id.* at 452, emphasis in original); and holds that there was constructive possession in the taxpayer, and he could exercise his Fifth Amendment rights.

The above quoted language is followed by a reference to Note 5 in *Kasmir.* Note 5 (*Id.* at 452) cites 8 Wigmore, Evidence (McNaughton rev. 1961) § 2308. (*But see* § 2312.) Therein, the following appears:

"It follows, then, that *when the client himself would be privileged* from production of the document . . . as exempt from self-incrimination, the attorney having possession of the document is not bound to produce. . . . On the other hand, if the *client would be compellable* to produce . . . then the attorney is equally compellable." (Emphasis in original.)

Again, we point out—the *Kasmir* holding rests upon the client's having his Fifth Amendment privilege. In the instant case, Miss Sibson did *not* have such a privilege because of the immunity granted her.

We also note that the Court in *Kasmir* cites for support the language in *Judson* which we have previously quoted: that the attorney's ability to assert the Fifth Amendment on behalf of his client depends upon the client's ability to assert the privilege on his own behalf. Hence for the same reason stated by this Court in distinguishing *Judson, Kasmir* is also distinguishable.

The court in *Kasmir* goes on to rule that while "[t]he attorney-client *relationship,* as distinguished from the attorney-client privilege," cannot be asserted

"as a basis for denying enforcement of the summons . . . the . . . client may still have a legitimate expectation of privacy . . . because of the attorney-client relationship, an expectation of privacy which helps to give substance to a Fifth

Amendment privilege contention." (*Kasmir* at 453).

As to the attorney-client *relationship* claim, we find *Kasmir* distinguishable from the instant case. As *Kastigar* instructs, a grant of use immunity precludes any Fifth Amendment claim of privilege. In the absence of immunity, as was the case in *Kasmir,* the attorney-client relationship may well give rise to an expectation of privacy, but if use immunity can constitutionally be used to invade a client's privacy, to the extent of forcing him to testify to acts which may amount to legal and moral crimes, it certainly can be used to force disclosure of information concerning a client's fee arrangement with his attorney.

In striking the delicate balance between the information needs of the courts in administering justice and a party or witness's right to privacy, it is sufficient that testimony elicited from a person not be used against him without a valid waiver of his Fifth Amendment privilege or the granting of immunity. But a party's or witness's residual rights of privacy; that is, the discomfort *any* witness has in testifying against his wishes about matters within his knowledge, cannot outweigh the court's interest in getting the facts necessary to make a reasoned and informed decision. Were this not so, no immunity, indeed no subpoena, could stand—since both invade upon this residual right of privacy.

Little case law is cited by appellant in his brief as to the alleged Fourth Amendment defense. We see no relevancy to Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). As Justice Harlan states: "[t]here is a two fold requirement . . . an actual expectation of privacy, and . . . that the expectation be one that society is prepared to recognize as 'reasonable.' " (*Id.* at 361, 88 S.Ct. at 516 (concurring opinion)). The requirement that a citizen testify before a grand jury in response to a lawful subpoena is recognized by society, and the courts, as reasonable, particularly when the protection of immunity has been granted.

We hold that the refusal to testify following the protection from self-incrimination by the granting of use immunity is unreasonable.

■ As to the First Amendment defense, we see no way in which the answer to the question would interfere with the appellant's right of association, and deem the defense without merit. Perhaps this is why the defense was not argued in the brief, or at oral argument.

■ Appellant argues that forcing him to answer the questions asked him before the grand jury is violative of his client's Sixth Amendment rights. We find it difficult to see how the disclosure of fee information will impair his client's right to effective counsel. Rather, it seems to us that, as in the situation of insurance company's paid attorneys representing a policy holder, disclosure of payments from others to represent a client may be necessary to insure that an attorney is truly representing his client and not some other interest, and for the court to satisfy itself that a client is being effectively represented.

■ Any disclosure a party does not wish to make will entail some type of chilling effect. However, not all such "chills" amount to an impairment of constitutional rights. Viewed in this light we feel that any chilling effect which may be felt from having fee arrangements aired does not appear to us to be unwarranted or constitutionally infirm.

Counsel for appellant suggests "horribles" that will occur if this contempt order is affirmed—that this matter "is only the latest example of what is contended to be the widespread abuse of the intended function of the grand jury process by officials of the United States Government." (Op. Br. at 12).

The best answer to this is the last paragraph of the Cromer decision, quoted above. To paraphrase it:

"Michaelson does not demonstrate, as he must, how, as a result of revealing the answers to the specific questions that he has been ordered to answer, there will be a violation of his rights.

His speculation and conjecture are insufficient. It is well established that the privilege protects against real danger, not remote or speculative possibilities."

We finally turn to appellant's claim that the Code of Ethics of the American Bar Association (herein ABA), and the California Business and Professions Code 607 E (sic., 6068) entitle him to refuse to answer. In his brief, he also relies upon Nevada Statute § 49.095; Supreme Court Rules, State of Nevada, § 1, Rule 179, and the ABA Code of Professional Responsibility Dr. 4–101–(A), (B)(1), and the case of People v. Canfield, *supra*.

■ While we recognize the power to compel testimony is not absolute, we seriously doubt if any local, state, regional, or national bar association would seriously intend, or contend, that any rules or recommendations or ethical advice they encourage their members to follow, can by such mere approval, create a legal right or privilege in any attorney to disobey the laws of the United States, or the interpretation thereof by the United States Supreme Court. Can it be seriously suggested that if a lawyer is told by his client, "This information is a secret between us," the client can by such an expression foil and render totally void and nugatory the many immunity acts passed by the Congress of the United States over the past century? The treatment by the Supreme Court in *Kastigar, supra*, 406 U.S. 17 at 443, 92 S.Ct. at 1655, et seq., of the history of the right to compel testimony, the immunity statutes, and the Fifth Amendment privilege would certainly indicate the contrary:

"The commentators, and this Court on several occasions, have characterized immunity statutes as essential to the effective enforcement of various criminal statutes. As Mr. Justice Frankfurter observed, speaking for the Court in Ullman v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), such statutes have 'become part of our constitutional fabric.' Id. at

438, 76 S.Ct. [497] at 506." *Kastigar, supra,* at 447, 92 S.Ct. at 1658.

We applaud the ABA's Code of Professional Responsibility, Ethical Consideration 4–4, which provides

"The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidence and secrets of his client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge."

We do not interpret this, or any other of the Codes referred to by appellant as authorizing any lawyer to disobey the laws passed by the Congress, as interpreted by the Supreme Court. We concede this argument was urged in *Kasmir,* and referred to in the majority opinion. We prefer the reasoning of the dissent. Until the Supreme Court rules to the contrary, we do not propose to follow the *Kasmir* ruling, which of course, is not binding in this circuit.

In the case of People v. Canfield, *supra,* the California Supreme Court held that a financial statement filed by a defendant with his public defender was protected by the lawyer-client privilege, and should not have been entered in evidence, but that such error was harmless, and the conviction affirmed.

■ Appellant's reliance on *Canfield* is inapposite. First, we note that it is the Nevada law relative to the attorney-client privilege which is at issue in this case, not California's. Under Nevada law, as interpreted by this Court in *Cromer, supra,* information concerning fee arrangements between an attorney and his client are not privileged (except in exceptional cases not here relevant). Second, in *Canfield* Mr. Justice McComb specifically declined to consider whether "forcing disclosure of the statement at his trial was a violation of his rights under the Fifth and Sixth Amendments to the United States Constitution, as well as article I, section 13 of the California Constitution, and also denied him equal protection of the laws." (*Id.,* 12

Cal.3d at 707, 117 Cal.Rptr. at 86, 527 P.2d at 638).

We find no merit in appellant's reliance on these matters urged as recited above.

■ We wish to make very clear that in holding that testimony elicited from Mr. Michaelson under a grant of immunity is not otherwise privileged, we do not reach the question of what the scope of the immunity granted to him and Miss Sibson is. We hold that Michaelson is not privileged to withhold his information from the Grand Jury. We do not reach the question of whether testimony elicited from Mr. Michaelson may be used in a subsequent prosecution against Miss Sibson; and vice versa, should Mr. Michaelson be prosecuted, we will not anticipate this issue since the situation has as yet not arisen. Indeed, it would be constitutionally improper for us to reach this question since the issue lacks the necessary facts to make it concrete. This issue is not only unripe, the case is non-existent. This Court does not intend to and cannot, issue an advisory opinion on a hypothetical fact situation.

Finding no merit in any of appellant's allegations of privilege, we

Affirm.

MERRILL, Circuit Judge, dissenting:

I can conceive of no purpose for seeking the information covered by the questions in issue except to show a connection between Miss Sibson and some unknown person thought to have referred her to Michaelson and to have undertaken to pay his fee. If such connection be relevant, one may expect that some inference of guilt of Miss Sibson may rationally be drawn from the fact of the connection. Asking these questions of Michaelson can serve alternative purposes: (1) if the answers correspond to those already given by Miss Sibson, the United States may have escaped Miss Sibson's use immunity by obtaining the information from another source; (2) if the answers differ from those given by Miss Sibson, they may serve to expose her to a charge of perjury. I dislike this

reliance upon the attorney-client relationship to accomplish incrimination of the client.

The majority may be correct in concluding that the attorney-client *privilege* does not attach to the information sought since that information was not the subject of a confidential communication strictly defined; and that under Couch v. United States, 409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973), Miss Sibson's Fifth Amendment rights cannot be asserted by Michaelson. I am not prepared to accept these propositions without further study, which time simply does not permit. Assuming the majority to be correct, however, to me that is not the end of the matter.

Where the circumstances suggest that the client may be incriminated by the information sought from the attorney, and where that information came to the attorney's knowledge by virtue of the attorney-client relationship, the appropriate test in my judgment should not be limited to technicalities of confidentiality or Fifth Amendment privilege. Voluntary revelation of such information by the attorney surely would be regarded as a breach of professional ethics. I cannot accept the view that the courts are duty bound in every case to coerce such breach through power of the civil contempt sanction. This would be to require the courts to act in derogation of a relationship to which they traditionally accord high respect.

I cannot, then, agree that the only limits upon what a court may require an attorney to divulge respecting his client are those prescribed by privilege and the Fifth Amendment. Where ethical considerations intervene, surrender of the information to the Government should no longer be regarded as a matter of unquestionable governmental right. Public need to obtain the information from this source should not be blindly accepted without giving consideration to the interests represented by the attorney-client relationship, and a court order should be the result of an exercise of judgment seeking to reconcile the competing interests. Absent some showing of weighty governmental need of this information from this source, in my judgment the order should not have issued.