**In re JANUARY 1976 GRAND JURY.**

**Edward M. GENSON, Attorney at Law, Witness-Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 76–1065.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 24, 1976.

Decided March 29, 1976.

Rehearing and Rehearing En Banc Denied May 18, 1976.

Sam F. Adam, Chicago, Ill., for witness-appellant.

Samuel K. Skinner, U. S. Atty., Jeffrey J. Kent, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before PELL, TONE and BAUER, Circuit Judges.

PELL, Circuit Judge.

This is an appeal from an order of the district court dated January 15, 1976, adjudging appellant, an attorney, in civil contempt and ordering him to be remanded to the custody of the Attorney General "until such time as he shall purge himself of this contempt or the discharge of the January 1976 Grand Jury, whichever comes first." The appeal raises questions concerning the scope of the Fifth Amendment testimonial privilege and the standing of an attorney to invoke that privilege on behalf of his clients, and the scope of the attorney-client privilege. Other claimed violations of constitutional rights are asserted.

## I. STATEMENT OF FACTS

On December 30, 1975, between 9:00 and 9:30 A.M., the Bellwood Savings and Loan Association of Bellwood, Illinois, was robbed of approximately $6,120.00 by a man and a woman. Investigators from the Federal Bureau of Investigation uncovered information leading to the identification of two suspects, Paul Bijeol and Sharon Kay Holloway, and a complaint and warrant were sworn and issued on December 31, 1975, naming these two suspects.

Investigation and interview disclosed that Bijeol had been in the employ of Edward Genson, attorney at law, prior to the commission of the robbery. Investigation also disclosed that Bijeol and his alleged female accomplice were in the Chicago office of Mr. Genson and one of his associates, Mr. Barry Goodman, between 10:00 A.M. and 12:00 noon on December 30, 1975, approximately one to three hours after the commission of the robbery. Further, Government investigators learned that the male suspect had transferred $200.00 in cash to Mr. Goodman at this time. It was also learned that Bijeol met with Genson at approximately 1:30 P.M. and again at approximately 5:30 P.M. on the day of the robbery.

At approximately 10:00 A.M. on December 31, 1975, Genson was notified by an agent of the FBI that any monies which he had received or would receive as fees for his legal services for the two suspects might constitute proceeds of the robbery. In response to an inquiry of an FBI agent, Genson stated that he received "something" from the male suspect, but he refrained from disclosing what the "something" was. In response to a subsequent inquiry whether he had in fact received any monies or any firearms from either of the two suspects at the time of or subsequent to their meetings on the day of the robbery, Genson asserted the attorney-client privilege as a

basis for refusing to respond to the questions.

On January 7, 1976, Genson was served with a subpoena duces tecum requesting the production of

"[a]ny and all monies paid or delivered to you or into your care, custody, and control by Paul Bijeol or Sharon K. Holloway, . . . or their agents, subsequent to 9:00 A.M. on Tuesday, December 30, 1975." [1]

On January 9, 1976, Genson filed a motion to quash the subpoena. On January 15, 1976, after memoranda had been filed and arguments heard, Chief Judge Parsons denied the motion to quash and ordered Genson to appear before the grand jury and to comply with the subpoena. On that afternoon, Genson appeared before the grand jury and refused to comply with the subpoena or to answer a question pertaining to his receipt of monies from Bijeol.

The grounds for this refusal were the assertion of an attorney-client privilege, the Fifth Amendment privilege against self-incrimination on behalf of a client, the Fifth Amendment right to due process, the Fourth and Ninth Amendment right to privacy, the Fourth Amendment right prohibiting unlawful searches and seizures, and the Sixth Amendment right to counsel. The Government then petitioned for an order to compel testimony and to produce evidence. The witness again appeared before Chief Judge Parsons, who ordered him to proceed forthwith to the place of meeting of the Grand Jury, to answer the questions which he was asked in regard to the monies, and to produce said monies as required of him, if in his possession, without further assertion of the attorney-client privilege, the self-incrimination privilege of his client, or his client's Sixth Amendment right to counsel.

The appellant then returned to the grand jury, where he again refused to comply with the subpoena or the order of the court. After this second refusal, the Government moved for a rule to show cause why Genson should not be held in contempt. The court held a hearing, entered a finding of contempt, and ordered Genson confined.[2] Execution of the sentence was first stayed until January 22, 1976, and a subsequent order stayed execution of the sentence pending this appeal.

The panel of this court hearing this case was in entire agreement as to the result to be reached in the case but was not in similar accord as to the reasons for reaching the result. The opinion following represents the views of Judge Pell supporting the result reached. Judges Tone and Bauer have set forth their views of the supportive reasons for the result reached in a separate concurring opinion which insofar as it is in conflict with Judge Pell's opinion represents the majority view of the court. The somewhat unorthodox method of handling the

---

1. A second part of the subpoena required the production of "[a]ny and all firearms and/or weapons, including but not limited to, one silver-colored revolver or facsimile thereof," delivered to Genson by Bijeol or Holloway subsequent to 9:00 A.M. on December 30, 1975. In one of his appearance before the grand jury, Genson made a statement for the record in which he stated that at no time subsequent to 9:00 A.M. on December 30, 1975, had he received any pistol, revolver, or another firearm or weapon from any person or any source in the entire world. We, therefore, have only the issue of the money phase of the subpoena before us.

2. We note that, by its terms, the order to produce and to testify did not preclude the appellant from asserting Fourth and Ninth Amendment rights. At the hearing on the rule to show cause, however, the judge asked the appellant whether he believed that a truthful answer to the propounded question would deny the clients their right to privacy. Moreover, the oral argument before the judge clearly focused on the question whether an attorney, under circumstances such as were present, could claim Fourth Amendment rights. We interpret the judge's statement that "under the circumstances of this case it would be necessary for the attorney to answer" as an implicit ruling that the Fourth and Ninth Amendments provided no just cause for Genson's refusal to produce the monies and to answer the question. We do not think that the variance between the terms of the court order and the actual statement of reasons given by Genson for his action presents any significant problem.

disposition has been necessitated by the need for an early disposition of the case.

## II. THE FIFTH AMENDMENT TESTIMONIAL PRIVILEGE

The major issue in this appeal is whether a subpoena duces tecum requiring an attorney to produce for a grand jury investigation monies turned over to him by his clients and believed to be proceeds of a bank robbery infringes his clients' Fifth Amendment privilege against compelled self-incrimination. Both the appellant and the Government admit that there is little case law exactly on point, possibly because the fruits of bank robberies, if recovered at all, are usually retrieved either pursuant to a valid search warrant or a search incident to a lawful arrest. Although there is judicial language in the decisions that bears upon the narrow issue in this appeal, it essentially is a question of first impression.

The Fifth Amendment privilege against self-incrimination does not merely encompass evidence which may lead to a criminal conviction, but also includes information which would furnish a "link in the chain of evidence" that could lead to prosecution as well as evidence which an individual reasonably believes could be used against him in a criminal prosecution. *Maness v. Meyers,* 419 U.S. 449, 461, 95 S.Ct. 584, 592, 42 L.Ed.2d 574, 584 (1975); Accord, *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951). One of the important policies underlying the testimonial privilege is the protection of an individual's "private enclave," *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 55, 84 S.Ct. 1594, 1596, 12 L.Ed.2d 678, 681 (1964). In order to promote the basic policy objectives which it was believed the framers sought to achieve, the Supreme Court has recognized that the Fifth Amendment privilege respects a private inner sanctum which "necessarily includes an individual's papers

and *effects* to the extent that the privilege bars *their compulsory production and authentication . . .."* (Emphasis supplied); *Bellis v. United States,* 417 U.S. 85, 91, 94 S.Ct. 2179, 2184, 40 L.Ed.2d 678, 685 (1974). Accord, *United States v. White,* 322 U.S. 694, 698, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542, 1545 (1944).

A series of recent Supreme Court decisions has established, however, that compulsion which makes a suspect or accused the source of real or physical evidence does not violate the testimonial privilege. *E. g., United States v. Dionisio,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); *United States v. Mara,* 410 U.S. 19, 93 S.Ct. 774, 35 L.Ed.2d 99 (1973); *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908, 916 (1966). The Government relies upon this series of decisions to bolster its contention that Genson's production of the monies, which it characterizes as mere physical evidence, would not be equatable with any self-incriminatory disclosures of a testimonial or communicative nature.

More precisely, the Government contends that Genson's compliance with the subpoena duces tecum would not represent an impermissible authentication of the physical evidence. The only arguable testimonial disclosure which would accompany Genson's production of the subpoenaed monies would be the implied admission that the currency had been transferred to him from one or both of his clients.[3] The appellant meets this argument by observing that the challenged subpoena seeks not just items, but items that were allegedly obtained from the attorney's clients after a specified time on a specified day. Appellant thus argues that because the wording of the subpoena contains references to the "who" and the "when" of the alleged transfer of monies, it

---

3. We note that the Government's brief does not always highlight the fact that a question was asked of Genson which called for a direct, explicit response. The judge who issued the order was careful to note that "[w]e must be very careful about the words that are used." Earli-

er, the court observed: "You see, the order of this subpoena was first that he appear and second that he produce. Now, the order did not require that he answer all questions that were asked—"

necessarily involves assertive conduct which, as such, might well be interpreted to constitute an admission by Genson's clients.

The question of whether the monies constitute mere physical evidence or represent a testimonial utterance is not one to be categorically or easily answered. At oral argument, the appellant insisted that he stood in such a special relationship to his clients that the Government could not enforce a subpoena duces tecum against him. In sum, the Government could demand from Genson only what it might legitimately demand from his clients. Appellant insists that no one could fail to agree that the Government could not enforce a subpoena duces tecum against the robbery suspects demanding production of the monies. In response, the Government again underscored its view of the monies as physical evidence by arguing, without authority, that the grand jury has the power to subpoena the unrecovered proceeds of a bank robbery directly from the suspected clients.[4]

The other members of the panel in this appeal are of the opinion under the assumed facts of this case that even in the case of the suspects, compliance on their part with the subpoena would not possess sufficient aspects of testimonial character to activate the protective mantle of the Fifth Amendment. The author of the opinion is less certain as there would seem to him to be an implied assertion whereby the monies so produced would furnish a link in the chain of evidence that could lead to prosecution. *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124.

We need not decide the question of testimonial dimension, however, as it does not resolve the question for decision. Here, the subpoena is not being served directly upon the suspects. The clients allegedly transferred monies to Genson, their attorney. He is the witness who has been ordered to appear before the grand jury. His implied admission that he received the monies from his clients on the very day of the bank robbery is not the direct testimony of the suspects themselves. As the Supreme Court has explained, "[t]he constitutional privilege . . . is designed to prevent the use of legal process to force *from the lips of the accused individual* the evidence necessary to convict him or to force him *to produce and authenticate* any personal documents or *effects* that might incriminate him." (Emphasis supplied.) *White, supra,* 322 U.S. at 698, 64 S.Ct. at 1251, 88 L.Ed. at 1545; Accord, *Bellis, supra,* 417 U.S. at 88, 94 S.Ct. at 2183, 40 L.Ed.2d at 683. Even if one assumes that monies of the clients are "effects," although certainly they are not personal documents, and even assuming that the language of *White,* which has been approvingly quoted in *Bellis,* bears a direct relationship to the situation revealed in this appeal whereby compliance with subpoena would involve testimonial dimensions, a reversal would not be required here. In simple terms, even if there were testimonial disclosure, it is that of Genson, the attorney, not that of his clients.

It is well established that the compulsory processes of the judiciary stand available to require the presentation of evidence in court or before a grand jury. *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Moreover, it has been recently established that a lawyer is not subject to the penalty of contempt for *advising* his client to refuse on Fifth Amendment grounds to produce materials demanded by a subpoena duces tecum where the lawyer believes in good faith

---

4. We note that the Government has made a major change in position. In its Response to Petitioner's Motion to Quash Subpoena, the Government candidly admitted, "It is beyond dispute that the government could not compel Bijeol and Holloway themselves to produce the money and gun because they would be required to produce items personal to them and still within their possession and control." We recognize that the position taken at oral argument is a qualified one, insofar as the Government confines its statement to the situation where the money is regarded as non-testimonial.

At this stage of the proceedings, we need not determine whether any monies recovered by means of the challenged subpoena could be admitted as a physical exhibit offered as proof of a necessary element of the alleged violation of 18 U.S.C. § 2113(d).

that the material may tend to incriminate his client. *Maness v. Meyers, supra.* In this appeal, however, the court confronts not the situation where the attorney advises his client to refuse production but rather one where the attorney himself, now the alleged possessor of the demanded item, declines to produce.

Unless the relationship of attorney and client is completely *sui generis,* as appellant argues, the author of this opinion finds no precedents supporting Genson's refusal to produce what may possibly be the fruits of a violent crime. Although the author is not aware of any cases directly in point, he finds applicable decisional principles which compel the conclusion that the appellant's refusal was not justified under the mantle of the Fifth Amendment.

In the leading case of *Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), the Supreme Court observed that constitutional provisions for the security of person and property should be liberally construed. It is the clear duty of the courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. However, the *Boyd* court firmly recognized that stolen goods are an entirely different matter than personal papers or documents:

> "The search for and seizure of stolen or forfeited goods . . . are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him." *Id.* at 623, 6 S.Ct. at 528, 29 L.Ed. at 748.

The quoted excerpt related to a Fourth rather than a Fifth Amendment context, but a recognition that a search for and seizure of stolen goods "differ *toto coelo*" from the search for and seizure of personal papers, *id.,* represents a durable ground for undertaking an analysis of the policy dimensions of the present case. Even in the light of the *Boyd* admonition that broad and liberal construction of constitutional rights is the preferable approach, no basis is discernible for thinking that the Fifth Amendment testimonial privilege was intended to allow an attorney to suppress or secrete the physical fruits of an armed robbery.

The attorney-client relationship is not so close or special as to create some form of mystical identity between the two natural persons. No reason exists to obliterate the distinction between the person of the attorney and that of the client. The Fifth Amendment explicitly prohibits compelling an accused to bear witness against himself; it does not proscribe incriminating statements elicited from another. *Couch v. United States,* 409 U.S. 322, 328, 93 S.Ct. 611, 615, 34 L.Ed.2d 548, 554 (1973). As stated by Mr. Justice Holmes with typical succinctness, "[a] party is privileged from producing the evidence, but not from its production." *Johnson v. United States,* 228 U.S. 457, 458, 33 S.Ct. 572, 572, 57 L.Ed. 919, 920 (1913). In the present case, the compulsion of the subpoena is directly exerted on Genson and not upon his clients. Unless he has standing to invoke on their behalf the Fifth Amendment privilege, the appellant has shown no just cause for failing to comply with the subpoena or the order of the court.[5]

The touchstone for analysis of the question of standing must be the established rule that the Fifth Amendment privilege adheres basically to the person, not to the information or evidence that may incriminate him. See *Couch, supra,* 409 U.S. at 328, 93 S.Ct. at 615, 34 L.Ed.2d at 554. Counsel have directed attention to a number of cases which have examined the intricate policy dimensions of standing analysis, but none of the precedents is precisely applicable to the unique facts of the present appeal. The question of an attorney's

---

5. The majority of the panel being of the opinion that there is no testimonial dimension involved in the present situation would find it unnecessary to determine the question of standing. The balance of the discussion on the present subject represents the views of the writer of the opinion and is necessitated by his view that there is an underlying testimonial dimension situation.

standing to invoke the testimonial privilege on behalf of his clients should be approached on a case-by-case basis. In the author's view, the best method of accomplishing this analytic task is to examine anew the meaning and thrust of *Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906).

In *Hale,* the Supreme Court observed that "so strict is the rule that the privilege is a personal one that it has been held in some cases that counsel will not be allowed to make the objection." *Id.* at 70, 26 S.Ct. at 377, 50 L.Ed. at 664. On the basis of still another passage in the *Hale* opinion, a number of lower courts have ruled that an attorney does not have standing to assert his client's Fifth Amendment privilege. See *United States v. Goldfarb,* 328 F.2d 280, 283 (6th Cir. 1964), *cert. denied,* 377 U.S. 976, 84 S.Ct. 1883, 12 L.Ed.2d 746; Accord, *Bouschor v. United States,* 316 F.2d 451, 458 (8th Cir. 1963). On the other hand, a number of recent lower court decisions hold that an attorney, at least under certain circumstances, does have standing to assert his client's Fifth Amendment privilege.[6] Clearly, the courts which have faced the standing question have reached varying results. See *United States v. Fisher,* 500 F.2d 683, 697 n. 10 (3d Cir. 1974) (en banc) (Hunter, J., concurring in part and dissenting in part), *cert. granted,* 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975), *oral argument,* 44 U.S.L.W. 3269. The more recent manifestation of a lack of unanimity among the circuits has emerged in cases involving tax investigations. The interpretative problem in those cases has revolved around differing reactions to the meaning and thrust of the Supreme Court decision in *Couch, supra.*

Apart from the recurring context of tax investigations, where an anticipated Supreme Court decision resolving the conflict between the Third Circuit and Fifth Circuit as exemplified in *Kasmir* and *Fisher* will provide more definite guidance, the basis for the purported conflict among the circuits over the standing question appears to stem from differing analyses of an attorney's status as an agent, albeit one held to fiduciary standards, for his client. The source of the disagreement is the language of *Hale:*

> "The right of a person under the Fifth Amendment to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person." *Id.* 201 U.S. at 69–70, 26 S.Ct. at 377, 50 L.Ed. at 663.

If the attorney is just like any other agent, the quoted excerpt points to a conclusion that the lawyer has no standing to assert his client's testimonial privilege. See *Goldfarb* and *Bouschor, supra.* Those courts which have reached the opposite conclusion have thought that an effort to distinguish the person of the attorney from that of the client would, at least under some circumstances, represent a technical and niggardly construction of constitutional guarantees that vitiates their practical efficacy.

It is not necessary to set forth the broad outlines of the policy reasons which have engendered conflict among the circuits. In *Kasmir, supra,* and in *United States v. Judson,* 322 F.2d 460 (9th Cir. 1963), there are articulate expositions of the reasons why a recognition of standing may appear appropriate. As the *Judson* court stated, "The attorney and his client are so identical with respect to the function of the evidence and to the proceedings which call for its production that any distinction is mere sophistry." *Id.* at 467. Clearly, there is a respectable line of authority for the proposition that the law has traditionally considered the client and his attorney as one in matters relating to the compulsory production of documents. As Professor Wigmore has observed,

---

6. For a list of cases supporting the position that an attorney may claim the self-incrimination privilege on behalf of his client, see *United States v. Kasmir,* 499 F.2d 444, 454 (5th Cir. 1974), *cert. granted,* 420 U.S. 906, 95 S.Ct. 824, 42 L.Ed.2d 835 (1975), *oral argument,* 44 U.S. L.W. 3269.

"[W]hen the client himself would be privileged from protection of the document, * * * as exempt from self-incrimination, the attorney having possession of the document is not bound to produce. Such has invariably been the ruling. On the other hand, if the *client would be compellable* to produce * * * then the attorney is equally compellable, if the document is in his custody, to produce under the appropriate procedure." (Emphasis in original.) 8 Wigmore, Evidence § 2307 (McNaughton Rev.1961).

The problem with resting a decision on this extract is that subsequent cases have tended to undermine its accuracy. The emerging conflict in the circuits over the standing question demonstrates that it is now inaccurate to assert that the courts have invariably ruled that the attorney having possession of the document is not bound to produce. That is the basic issue which is presented for decision; and the Courts of Appeals, as noted, have taken divergent approaches since the *Couch* decision of 1973.

The writer of this opinion is not persuaded that the post-*Couch* cases creating a conflict among the circuits on the standing question vis-a-vis tax investigations are apposite to the present appeal. He does not read *Kasmir* as establishing a rule of attorney standing in any and all circumstances. As he reads that opinion, the rationale of which the Supreme Court is presently considering, it finds standing because of today's necessity for tax-payers to depend upon the advice of attorneys:

"When the Constitution was first ratified, the citizens of this country were not yet dependent upon attorneys to decipher complex tax laws. And at that time, the specter of the more brutal forms of compulsory self-incrimination was all that required concern. Today, however, the government's power can be used to stimulate a taxpayer's dependence upon his attorney and the predictable transfer of his records. Once so transferred, the government argues, the materials are subject to compelled disclosure. In our

judgment, the inherent power thus to compel indirectly an individual's self-incrimination is curbed by the Fifth Amendment as effectively as the power to compel the same result directly." 499 F.2d at 454–55.

In essence, then, the Fifth Circuit has accepted the basic rationale of *Judson*. Interestingly, the Ninth Circuit has apparently receded from its earlier position. The author finds in the case *In re Michaelson*, 511 F.2d 882 (9th Cir. 1975), *cert. denied*, 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469, a questioning by the panel assigned that appeal whether *Judson* possesses viability after *Couch*. 511 F.2d at 890. Whereas the *Judson* court stated that the attorney and his client were so identical with respect to the function of the evidence and the proceedings which called for its production that any distinction was mere sophistry, the *Michaelson* panel followed *Couch* and baldly asserted that the Fifth Amendment privilege is personal.

Amid the confusion engendered by *Couch,* it is deemed preferable to return to the two quoted passages of *Hale*. It does not appear that the reference to the fact that some cases, never identified, had held that counsel would not be allowed to make objection does not, without more, lead to an automatic rule of *no standing* for attorneys to assert a client's testimonial privilege. If that were true, the disparity of views among the lower courts would necessarily imply that some panels were flatly refusing to follow a binding Supreme Court ruling.

In this appeal, the court is concerned not with the compelled production, either by IRS summons or grand jury subpoena, of personal papers or documents but rather with the demand for monies which may have been stolen from a federally insured savings institution. The important testimonial communication in this case is that the suspects have had at a point in time subsequent to the armed robbery possession of the stolen monies. Such an evidentiary fact would appear to the author of this opinion to be an important link in the chain of

evidence.[7] As Judge Gibbons observed in his concurring opinion in the *en banc Fisher* decision:

"Three separate possible forms of communication may be involved with a subpoena duces tecum. One is the communication involved in the identification or authentication of the document. A second is the communication involved in acknowledging the fact of possession. The third is the communication involved in the contents of the document." 500 F.2d at 693.

In that case, as in *Kasmir,* the truly incriminating communication arose from the contents of the document. Here, by way of contrast, the incriminating communication relates to the possession of the stolen monies.

In the judgment of the author of this opinion, it is unnecessary to reach the broader question of an attorney's standing to assert his clients' Fifth Amendment privilege under circumstances where tax records or work papers are demanded. This case is distinguishable on its facts, and there would appear to be no reason to anticipate that the Supreme Court resolution of the standing issue in the tax context will control this case. Adoption of a rule of no attorney standing in tax fraud or tax investigation cases might provide persuasive authority for a conclusion of no standing in this case, but adoption of the contrary rule of standing in tax cases would not be directly applicable. The recognition that an attorney need not produce stolen monies in response to a subpoena would provide a

mechanism by which a member of a learned profession could become the privileged repository of the fruits of a violent crime. There is no reason for thinking that the policy of respecting the private enclave of individual citizens reaches that far.

For the separate reasons hereinbefore set out, it is the holding of this court that Genson's reliance upon the Fifth Amendment is misplaced. Specifically, the majority of the panel is of the opinion that the money itself is non-testimonial and that its delivery was not assertive conduct. In this situation, the attorney is simply a witness to a criminal act. The fact that the attorney is also a participant in the act is irrelevant since he is not asserting his own privilege against self-incrimination. The author of this opinion rests his opinion upon the lack of standing on the part of the lawyer to assert the Fifth Amendment claim on behalf of his clients. Whatever implied testimony arises from the act of production is that of the lawyer. This remains true even if the wording of the subpoena contains implied questions regarding the "who" and the "when" of the alleged transfer.

## III. THE ATTORNEY–CLIENT PRIVILEGE

Genson also based his refusal on the attorney-client privilege. Analytically, of course, this privilege is not identical with the Fifth Amendment right, even though closely-related concepts of privacy and confidentiality play an important role in determining the scope of the two privileges. Nor is there a similarity of analysis as

---

7. It is noted from the record that the suspects have surrendered to the United States authorities pursuant to a complaint and warrant seeking their arrest for an alleged violation of 18 U.S.C. § 2113(d). It is clear from *United States v. Gaddis,* 424 U.S. 544, 96 S.Ct. 1023, 47 L.Ed.2d 222, 44 U.S.L.W. 4293 (1976), that they could not be convicted and sentenced for this offense while simultaneously being convicted and sentenced for a violation of 18 U.S.C. § 2113(c), which prohibits knowing possession of stolen monies.

Under *Gaddis,* however, the grand jury could return an indictment containing a § 2113(c) count against the two suspects. See 424 U.S. at 547, 96 S.Ct. at 1026, 47 L.Ed.2d at 227, 44

U.S.L.W. at 4294. At this stage of the proceedings, where the grand jury has initiated but has not completed its investigation, it is premature to draw any conclusions regarding the exact significance of the evidentiary fact of possession. Nonetheless, that evidentiary fact would, at the very least, appear to the author of this opinion to serve as a link in the chain of evidence that could lead to prosecution; and Genson's clients could reasonably believe that the monies could be used against them in a criminal prosecution. *Maness, supra,* 419 U.S. at 461, 95 S.Ct. at 592, 42 L.Ed.2d at 584; *Hoffman, supra,* 341 U.S. at 486, 71 S.Ct. at 818, 95 L.Ed. at 1124.

regards the issue of standing. The attorney-client privilege arose in the days of Elizabeth I from a consideration of the oath and the honor of the attorney rather than for the apprehensions of his client, and only in the middle of the nineteenth century did the privilege become substantially recognized as that of the client. *Radiant Burners, Inc. v. American Gas Association,* 320 F.2d 314, 318 (7th Cir. 1963).

The basis for the privilege is to afford the client a reasonable expectation of privacy and confidentiality with regard to disclosures made during the course of consultation with his attorney. The general rule is that, barring unusual circumstances, matters involving the receipt of fees from a client are not privileged. *In Re Grand Jury Proceedings,* 517 F.2d 666, 670–71 (5th Cir. 1975). That opinion, at n. 2, contains an extensive, albeit incomplete, collation of leading cases stating or applying the general rule. We find no basis for deviation here from the general rule.

Assuming that the alleged transfer of monies represented a retainer or a prepayment of fees, the fact of payment and the money itself would fall outside the scope of the privilege. Assuming that the monies were transferred not as a fee payment but as a bailment for the purposes of safekeeping, the appellant finds himself in a position closely analogous to the attorney in the case of *In re Ryder,* 263 F.Supp. 360 (E.D.Va.) *aff'd,* 381 F.2d 713 (4th Cir. 1967).

Before turning to an analysis of *Ryder,* we note Genson contends that he was under an ethical responsibility not to produce the demanded monies or to answer questions regarding them. The ethical obligation of a lawyer to guard the confidences and secrets of his client is broader than the attorney-client privilege. See A.B.A. Code of Professional Responsibility, EC 4–4 (1974).[8] Accordingly, our focus on the attorney-client privilege proceeds on narrower terms than appellant recognizes as appropriate.

We think that Genson cannot assert the attorney-client privilege as a justification for taking possession of what may be the fruits of a violent crime.[9] Even if the minority view expressed in this opinion that the clients' personal response to a subpoena duces tecum demanding production of the monies would be testimonial were adopted, it would be questionable whether the distinct act of transferring monies to the attorney represents a substantive communication. It is not necessary to resolve these doubts, for in any event, we are not persuaded that the transfer of such monies represents a communication for which the clients could legitimately anticipate confidentiality.

In *Ryder, supra,* an attorney secreted in his own safety deposit box the greater portion of the proceeds of a bank robbery as well as the sawed-off shotgun used in the crime. When Ryder asserted the attorney-client privilege in defense of his actions, the Fourth Circuit, in affirming an 18-month suspension from the practice of law, stated:

> "Viewed in any light, the facts furnished no basis for the assertion of an attorney-client privilege. It is an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the fruits and instrumentalities of a crime. Ryder's acts bear no reasonable relation to the privilege and duty to refuse to

---

8. Canon 4 of the Code is captioned, "A Lawyer Should Preserve the Confidences and Secrets of a Client." Each canon is divided into Ethical Considerations (EC) which in the Preamble of the Code are referred to as aspirational in character, representing objectives toward which every member of the profession should strive, and Disciplinary Rules (DR) which, unlike the Ethical Considerations, are mandatory in character. The first two sentences of EC 4–4 read:

> "The attorney-client privilege is more limited than the ethical obligation of a lawyer to guard the confidences and secrets of his

client. This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge."

9. Needless to say, we are assuming arguendo that Genson has possession of the monies. Nothing in the record before us warrants an inference that he does possess the monies or that any monies transferred, if indeed they were, were taken by his clients from the Bellwood Savings and Loan Association.

divulge a client's confidential communication." 381 F.2d at 714.

We are aware that the *Ryder* case was decided at a time when an earlier formulation of the canons of legal ethics was in force. The code of conduct then in force did not attempt to distinguish between aspirational provisions labelled as Ethical Considerations and minimum standards of conduct regulated by Disciplinary Rules. We do not think that the format change initiated in 1969 has any bearing on the scope of the evidentiary privilege.

Ethical Consideration 7–27 states that "[b]ecause it interferes with the proper administration of justice, a lawyer should not suppress evidence that he or his client has a legal obligation to reveal or produce." Our holding that Genson, under the circumstances of this case, cannot avoid compliance with the subpoena because of a claim of Fifth Amendment protection leads us to conclude that he is under a legal obligation to reveal or produce the monies which we have assumed arguendo that he has. Failure to comply with the subpoena and the subsequent court order to produce and testify effects the practical suppression of the sought after evidence.

We think that the *Ryder* conclusion is persuasive authority that the appellant cannot assert the privilege. We hold that Genson's refusal to testify or to produce does not bear a reasonable relation to the privilege and duty to refuse to divulge a client's confidential communications.

We express no opinion as to the extent, if any, to which the conduct of Genson does or does not equate with that of Ryder in the aforementioned disciplinary proceedings. The Supreme Court has consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a court's order to produce prior to any review of that order, and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal. *United States v. Ryan,* 402 U.S. 530, 532–33, 91 S.Ct. 1580, 1581–82, 29 L.Ed.2d 85, 88–89 (1971). We conclude that the appellant's risk of a contempt citation was an appropriate means of achieving pre-compliance review. See *Maness, supra,* 419 U.S. at 461, 95 S.Ct. at 592, 42 L.Ed.2d at 584.

## IV. THE SIXTH AMENDMENT RIGHT TO COUNSEL

A third contention in this appeal is that the subpoena duces tecum violated the clients' Sixth Amendment right to counsel. The appellant argues that the attempt of the Government to subpoena the known attorney of the two suspects and to make him the source of evidence against his clients impermissibly infringes upon their right to counsel. The Government insists that defendants have no right to *particular* counsel and that there is no reason why appellant could not be replaced by equally able counsel. The Government cites several cases from other circuits in support of its assertion that the Sixth Amendment argument is without merit.[10]

It may well be that eventually the appellant's compliance with the subpoena duces tecum and his testimonial response to questions regarding the alleged transfer of monies may place him in the position of being a source of evidence against either or both of his clients. We express no opinion as to whether the suspects having chosen to make the appellant a witness to their crime, if such should subsequently prove to be the fact, may properly invoke the Sixth Amendment to bar his eyewitness testimony at trial. For the purposes of this appeal, we deem any reliance upon a claim of deprivation of right of counsel in violation of the

---

10. *Ross v. Reda,* 510 F.2d 1172, 1173 (6th Cir. 1975); *United States v. Young,* 482 F.2d 993, 995 (5th Cir. 1973); *United States v. Sexton,* 473 F.2d 512, 514 (5th Cir. 1973); *United States ex rel. Baskerville v. Deegon,* 428 F.2d 714, 716 (2d Cir. 1970); *United States ex rel. Carey v. Rundle,* 409 F.2d 1210, 1215 (3d Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

Sixth Amendment is too premature to merit further consideration.

We have also examined the appellant's arguments regarding the claim that the Fifth Amendment right to due process, the Fourth and Ninth Amendment right to privacy, and the Fourth Amendment right prohibiting unlawful searches and seizures justified his noncompliance with the subpoena and his refusal to testify. We agree with the district court's implied ruling that the Fourth and Ninth Amendments provided no just cause for noncompliance or for the refusal to answer the question. See note 2 *supra*. Further, we are persuaded by the Government's argument that the subpoena does not violate the Fifth Amend-

ment right to due process of the appellant's clients and is not violative of the reciprocity requirements of Fed.R.Crim.P. 16. For the above stated reasons, the order of confinement is

**AFFIRMED.**[11]

TONE, Circuit Judge (concurring).

I am unable to agree with all that is said in Judge Pell's thoughtful opinion and find it unnecessary to reach some of the questions discussed there. I therefore state my views separately.

We must assume for purposes of this appeal that shortly after robbing a savings and loan association, the robbers delivered money stolen in the robbery to appellant.

---

**11.** Our examination of the record causes us to note another question. The notice of appeal in this case was filed on January 16, 1976. A procedural schedule calling for the filing of briefs and for oral argument on February 24, 1976, was subsequently adopted pursuant to Fed.R.App.P. 33. At the telephonic conference in which Theodore M. Becker, counsel for witness-appellant, and Assistant United States Attorney Ann C. Tighe participated, the opposing counsel agreed that 28 U.S.C. § 1826(b) was not applicable to this appeal. Subsequently, the Government argued in its brief that Section 1826(b) contains an absolute requirement that an appeal be finally disposed of not later than thirty days from its filing, citing *In re Michaelson,* 511 F.2d 882, 884 (9th Cir. 1975), *cert. denied,* 421 U.S. 978, 95 S.Ct. 1979, 44 L.Ed.2d 469; *In re Reed,* 448 F.2d 1276, 1277 (9th Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2479, 33 L.Ed.2d 332 (1972); *In re Charleston,* 444 F.2d 504, 506 (9th Cir. 1971), *cert. denied,* 404 U.S. 916, 92 S.Ct. 241, 30 L.Ed.2d 191.

The change in the Government's position was conveyed to this panel in the last footnote of its brief, which was filed on February 18, 1976, a date subsequent to the termination of the time allowed under 28 U.S.C. § 1826(b) for disposition of the appeal. Our examination of this footnote indicates that its wording is virtually identical with that contained in the Government's brief filed in *In re Bonk,* 527 F.2d 120 (7th Cir. Decided October 29, 1975, Opinion released November 21, 1975). We found it unnecessary to determine in *Bonk* whether or not the 30 day decisional time frame embodied in the statute was mandatory or directory, for the court decided the appeal within the statutory period.

In this instance, there has been no careful briefing or argument regarding the effect of this panel's non-compliance with the literal terms of Section 1826(b). As in *Brown v. Unit-*

*ed States,* 465 F.2d 371 (9th Cir. 1972), we express no opinion upon the constitutional question that might be presented if a party insists upon a final decision within the thirty-day period set forth in the statute. Under the present circumstances, we deem it undesirable to discuss or to analyze the cases brought to the attention of this court in the *Bonk* appeal. We merely note that our desire to insure thorough consideration and an informed decision, see *Beverly v. United States,* 468 F.2d 732 (5th Cir. 1972), together with our recognition of the factual and legal impossibility of effecting compliance with the literal terms of the statute, has induced us not to follow the *Bonk* pattern of first issuing an unreported order and then releasing a subsequent exposition of the rationale of the decision in a published opinion.

Assuming, but without deciding that the thirty-day time limit pertains to disposition of the appeal in the court of appeals, that the provision is mandatory rather than directory, and that such a mandatory time limit is constitutional so that this appeal must be decided not later than February 16, 1976, see *In re Charleston, supra* at 506, (which it obviously has not been), we find no language in § 1826(b) which divests this court of jurisdiction. The question of whether divestiture of jurisdiction to dispose of the appeal occurs once the required time of decision has passed has never been squarely faced, but our decision in *In re Dionisio,* 442 F.2d 276 (7th Cir. 1971), *rev'd,* 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973), represents at least *sub silentio* authority that jurisdiction to address the merits is not lost through noncompliance. The Supreme Court decision reversing this court's judgment in that case attached no significance to the fact that the appeal was decided thirty-two days after the filing of the notice of appeal.

If that occurred, the money was delivered either for safekeeping, with or without appellant's knowledge that it was stolen, or as an attorney's fee.

██ If it was the latter, the robbers voluntarily relinquished the money and with it any arguable claim that might have arisen from their possession or constructive possession. As Judge Pell points out, the payment of a fee is not a privileged communication. The money itself is non-testimonial and no plausible argument is left for resisting the subpoena.

██ If the money was not given as a fee but for safekeeping, the delivery of the money was an act in furtherance of the crime, regardless of whether appellant knew it was stolen. The delivery of the money was not assertive conduct and therefore was not a privileged communication, and, as we just observed, the money itself is non-testimonial. The attorney is simply a witness to a criminal act. The fact that he is also a participant in the act, presumably without knowledge of its criminal quality, is irrelevant since he is not asserting his own privilege against self incrimination. There is no authority or reason, based on any constitutional provision or the attorney-client privilege, for shielding from judicial inquiry either the fruits of the robbery or the fact of the later criminal act of turning over the money to appellant. Accordingly, it is immaterial that in responding to the subpoena appellant will be making an assertion about who turned over the money and when.

██ Finally, the proceedings have not yet reached the point at which we must decide whether, when the robbers have chosen to make appellant a witness to their crime, they may invoke the Sixth Amendment to bar his eyewitness testimony at trial, although, for me, to ask that question is almost to answer it.

For these reasons I concur in the judgment of affirmance.

Judge BAUER joins in this opinion.