57 N.Y.2d 66 (1982)
In the Matter of the Bronx County Grand Jury Investigation into the Attempted Murder of Clara Vanderbilt. Jonathan L. Rosner, Individually and as Attorney for Richard G. Rosen, et al., Appellants-Respondents; Pat Hickey, as Clerk of the Supreme Court of the State of New York, Bronx County, Respondent-Appellant. (And Another Proceeding.)
Court of Appeals of the State of New York.
Argued May 6, 1982.
Decided July 1, 1982.
Jonathan L. Rosner, appellant-respondent pro se, and for another, appellants-respondents.
Mario Merola, District Attorney (Steven R. Kartagener and Alan D. Marrus of counsel), for respondent-appellant.
Judges JONES, WACHTLER, FUCHSBERG and MEYER concur with Chief Judge COOKE; Judge JASEN concurs in part and dissents in part and votes to modify in a separate opinion; Judge GABRIELLI taking no part.
*70 Chief Judge COOKE.
The marital privilege may protect from discovery a tape recording left to one spouse by the other, even though the tape apparently was prepared in contemplation of suicide. Having attached, the marital privilege also precludes examining the tape for deletions or erasures. In addition, a tape recording having left the maker's possession, but which is regained without disclosure of its contents and delivered to the maker's attorney in order to obtain legal advice, is protected by a combination of the Fifth Amendment privilege against self incrimination and the attorney-client privilege.

BACKGROUND
Late on December 31, 1981, Clara Vanderbilt told an acquaintance that her friend Dr. Richard Rosen had requested that she meet him at his office at Montefiore Hospital, where they both worked. A short time later, Vanderbilt was found outside Dr. Rosen's office, unconscious from a severe bludgeoning about the head. Extensive surgery succeeded in preventing her death.
By January 3, 1982, Rosen knew he was a target of the assault investigation. On that day, he visited Vanderbilt at the hospital and learned that she had received a favorable prognosis. Rosen went to his office, made a tape recording at his desk, and then left the hospital. That evening, he attempted suicide at his house. Lifesaving emergency care was given to him at White Plains Hospital.
*71 After accompanying her husband to the hospital, Barbara Rosen returned to their home in the late evening of January 3. In the study, she found a cassette tape addressed to "Barbara" ("Tape No. 1"). Mrs. Rosen did not listen to the cassette, however.
The next day, January 4, Mrs. Rosen spoke to Arthur Olick, a neighbor and close friend of the Rosens who is an attorney. At this time, Dr. Rosen was still hospitalized and unconscious. After the wife related all the recent events, Olick expressed the need to retain counsel for Dr. Rosen and advised Mrs. Rosen to act for her husband. Mrs. Rosen told Olick of the tape she had found in the study and that she wanted to throw it away because of her aversion to listening to it. Olick instructed her to give the tape to him instead, to answer truthfully any questions about its existence, and to refer all inquiries to him.
Olick also suggested that Dr. Rosen's hospital office be examined for any other notes or tapes. Mrs. Rosen telephoned her husband's superior and requested that he look for such articles. A second cassette then was retrieved from Dr. Rosen's desk and delivered to Mrs. Rosen ("Tape No. 2"). Mrs. Rosen wrapped both cassettes and left them in Olick's mailbox on the afternoon of January 4.
After the doctor regained consciousness, he hired Jonathon Rosner to represent him. Mrs. Rosen took the stillsealed tapes from Olick and delivered them to Rosner by handing them to Rosner's 15-year-old son.
In the course of the police investigation, Mrs. Rosen voluntarily revealed the existence of Tape No. 1 and Rosner's possession of it. Rosner refused to comply either with a Grand Jury subpoena duces tecum seeking the tape or with an ex parte court order directing that the tape be surrendered under seal to the court for the purpose of protecting the tape's integrity. At a hearing on January 27, on an order to show cause and on a motion to quash the subpoena, Rosner admitted the existence and his possession of Tape No. 2. The court declined to rule whether the claimed privileges  attorney-client, marital, and that against self incrimination  protected the two tapes from discovery by subpoena. Instead, the court found Rosner to *72 be in contempt, but allowed him until the morning of January 29 to deliver the tapes to the court for safekeeping.
On January 28, Rosner and an Assistant District Attorney stipulated before a single Appellate Division Justice that the tapes would be surrendered to Supreme Court as ordered, but under seal. This was done on January 29. On the same day, a subpoena duces tecum was also served on Rosner for Tape No. 2.
On February 1, Rosner and Dr. Rosen commenced an article 78 proceeding to force the tapes' return. The Assistant District Attorney moved for the tapes' release to the Grand Jury. The Trial Judge declared that he would hear both applications on February 3 and, in the interim, he would listen to the tapes.
On February 3, the Assistant District Attorney served papers opposing the motion to quash and also another Grand Jury subpoena duces tecum seeking "any and all tapes, documents or written communications made by Mr. Rosner [sic] that are relevant to this investigation." Following the hearing, the Trial Judge, without discussing the privilege claims, ruled that the subpoenas should be quashed because the tapes were irrelevant to the Grand Jury investigation into Vanderbilt's assault, a ground not raised by petitioners.
On appeal, the Appellate Division unanimously reversed. It ruled that the contents of Tape No. 1  the tape to Mrs. Rosen  were protected by the marital privilege. In response to a claim of possible tampering, however, the Appellate Division ordered that Tape No. 1 be scientifically tested to ascertain whether it had "been altered in any manner". As to Tape No. 2, the court conclusorily stated only that "no privilege whatsoever can attach" and ordered its full disclosure to the Grand Jury, as well as any scientific analysis the Grand Jury might deem appropriate.

TAPE NO. 1
Petitioners Dr. Rosen and Rosner argue that Tape No. 1 is protected from discovery by virtue of the marital privilege, and that this protection extends beyond the tape's *73 contents so as to bar any scientific examination for tampering.
The marital privilege provides that "[a] husband or wife shall not be required, or, without consent of the other if living, allowed, to disclose a confidential communication made by one to the other during marriage" (CPLR 4502, subd [b]). Not protective of all communications, the privilege attaches only to those statements made in confidence and "that are induced by the marital relation and prompted by the affection, confidence and loyalty engendered by such relationship" (Poppe v Poppe, 3 N.Y.2d 312, 315; see, also, Prink v Rockefeller Center, 48 N.Y.2d 309, 314; Fisch, New York Evidence [2d ed], § 597, p 380). Whether a statement comes within the marital privilege is a preliminary question for the court, and involves a determination that must be made on an ad hoc basis (see Poppe v Poppe, supra, p 315; Fisch, New York Evidence, p 381; 4 Bender's, New York Evidence [1981 ed], § 245.03, subd [1], par [d], p 446.9).
The initial inquiry then is whether Dr. Rosen was induced by the marital relation to prepare Tape No. 1. Communications that would have been made regardless of the marriage's existence are not protected (see Parkhurst v Berdell, 110 N.Y. 386, 393-394). Nor are communications made without reliance on the marital relation or that are aimed at destroying the marriage (see Poppe v Poppe, 3 N.Y.2d 312, 315, supra; People v McCormack, 278 App Div 191, 196-197, affd 303 N.Y. 782).
Respondent argues that Tape No. 1 is not protected by the marital privilege because, as a suicide message, it was not intended to be received during the marriage and was made in contemplation of destroying it. This argument is unpersuasive. Whether the communication was meant to be received after death is irrelevant; the concern is whether the statement was made because of the marital relation (cf. New York Life Ins. Co. v Ross, 30 F.2d 80, 81 [letter to wife found with will held privileged]). To that extent, the communication is made "during marriage" for the purpose of the privilege. Nor is a suicide note the sort of communication excluded from the privilege's scope as aimed at destroying the marriage. That exception refers to *74 the nature of the statement itself (see, e.g., Poppe v Poppe, 3 N.Y.2d 312, supra [wife's admission of adulterous affairs destructive of marriage and thus not privileged]). A suicide note to one's spouse may be a last attempt to preserve the affection that gave rise to the marriage and to explain the reason for the drastic act.
Nothing in the record suggests any reason for concluding that Dr. Rosen's tape to his wife was not induced by the marital relationship. Thus, the tape must be considered as satisfying the first condition of the privilege.
The next issue in determining if the privilege should prevent disclosure is whether Dr. Rosen's statement to his wife, made via the cassette recording, was and remains "confidential". No question can be raised that Dr. Rosen made the tape and "delivered" it to his wife outside the presence of any third parties. Thus, at the time Mrs. Rosen discovered the tape, its message was unknown to anyone outside the marriage and so remained confidential for the purpose of the marital privilege.
That Tape No. 1 passed through the hands of Olick and Rosner's son, third parties with no justifiable interest in becoming privy to the marital privilege, did not destroy that privilege.[1] The privilege falls only when the substance of a communication, and not the mere fact of its occurrence, is revealed to third parties (see People v Hayes, 140 N.Y. 484, 495-496; cf. Prink v Rockefeller Center, 48 N.Y.2d 309, 313, supra). Neither person through whose hands the tape passed listened to the tape, but instead learned only of its existence. Nor did Mrs. Rosen's disclosure to the police reveal anything more than that the tape had been made. Indeed, to date, only Dr. Rosen and the Justices of the lower courts know exactly what message is contained in Tape No. 1. The communication's confidentiality must be deemed intact.
The Appellate Division expressly found the privilege applicable after listening to the tape. As such, there is no *75 basis for the order that the tape be scientifically examined. The request for such an order arose from the expressed concern that Tape No. 1 had been tampered with, particularly through deletions. Once it is determined that the contents of the tape were privileged, it is irrelevant whether there have been erasures or other deletions. What is not said and whether deletions have been made are as much a part of a communication's "substance" as are the statements actually made.[2]
In summary, Tape No. 1 was made by Dr. Rosen for his wife as a communication made in confidence and induced by the marital relationship. It is, therefore, protected by the marital privilege both as to its contents and as to examination for deletions.

TAPE NO. 2
Petitioners challenge the compelled production of Tape No. 2 by asserting a combination of the attorney-client privilege and the Fifth Amendment privilege against self incrimination.[3] In essence, petitioners claim that material protected in a client's hands should not lose that protection when possession is transferred to an attorney for the purpose of seeking legal advice.
This court's analysis starts with the recognition that Rosner may not directly assert any Fifth Amendment claim of protection held by Dr. Rosen. The Fifth Amendment states that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself" (US Const, 5th Amdt). Rosner, against whom the coercive power of the subpoena is directed, would not be incriminating himself by any production of the tape. There being no self incrimination involved, Rosner has no Fifth Amendment right; nor may he assert the right on behalf of his client, against whom no compulsion has been directed (see Fisher v United States, 425 US 391, 396-401).
*76 This does not end the inquiry, however. An attorney may rely on the attorney-client privilege to prevent discovery of materials that would not have been discoverable if in the client's hands (id., at p 404). This entails a two-pronged review. First, it must be determined whether the material sought was received by the attorney under circumstances giving rise to the attorney-client privilege (id., at pp 402-405). Second, if the attorney-client privilege attaches, attention is then directed to whether the material would be protected by some privilege had it remained in the client's possession (id., at p 405).
The attorney-client privilege generally extends to any "confidential communication made between the attorney or his employee and the client in the course of professional employment" (CPLR 4503, subd [a]). The privilege is intended to foster openness between counsel and client so that legal problems can be thoroughly and accurately analyzed (see 8 Wigmore, Evidence [McNaughton rev, 1961], § 2291). Not all communications are covered, however. Only those disclosures "necessary to obtain informed legal advice" fall within the scope of the privilege (Fisher v United States, 425 US 391, 403, supra).
Tape No. 2 was delivered to Rosner in contemplation of the pending Vanderbilt investigation. It was certainly necessary for Rosner to obtain it in order to render complete legal advice. But respondent urges that, in light of the number of people through whose hands Tape No. 2 pasqed, there was no confidential communication within the meaning of CPLR 4503 (subd [a]).
While it is true that the attorney-client privilege does not attach unless there is a "confidential communication" between counsel and his or her client, this does not require that all aspects of the communication, including its topic, must be confidential for the privilege to attach. Rather, the pertinent "confidence" arises from the attorney-client relationship and the privacy of the conversation or communication to the attorney. By way of example, a husband may consult an attorney in a divorce proceeding; although the wife may very well be aware of the subject matter of the husband's conversation, she will be unable to discover the *77 details of his discussion with his attorney from his attorney.
Moreover, a client's mere intent to disclose to third persons the substance of the discussion held with the attorney does not mitigate the privilege. There must be actual disclosure, otherwise the confidence arising from the attorney-client relationship has not been breached.
In the present controversy, Dr. Rosen has lost any privilege he may have had as to the fact that he made Tape No. 2. As to the tape's contents, however, Dr. Rosen has lost nothing. Notwithstanding his earlier intent to direct the tape's message to others, such was never done. That the tape passed through the hands of his colleagues, his wife, his friend Olick, and his attorney's son does not operate to destroy the confidentiality of the tape's message because none of these persons ever heard his words.[4] When Rosner finally received the tape, he received it with its contents undisclosed. Whatever the tape's initial purpose and intended audience, it ultimately was uttered only to Rosner by his client who was seeking legal advice and outside the presence of any third party with no intention that it be passed to another (see Fisher v United States, 425 US 391, 402-405, supra; cf. Rosseau v Bleau, 131 N.Y. 177, 183-184).[5] Thus, to the extent that Dr. Rosen's "communication" with Rosner is defined in terms of the tape's message, it remains confidential  made in the attorney-client relationship  and protected by the privilege.
Having concluded that the attorney-client privilege attaches, it must now be determined whether Tape No. 2 would be protected had it remained in Dr. Rosen's possession (see Fisher v United States, 425 US 391, 405, supra). That is, could Dr. Rosen have asserted rights under the Fifth Amendment to prevent the Grand Jury from obtaining the tape had the subpoena been directed to him personally?
*78 Under the holding in Fisher v United States (425 US 391, supra), a document is protected "if the act of producing it results in compelled testimonial self-incrimination" (Note, Constitutional Law  Taxpayer's Fifth Amendment Privilege Against Self-Incrimination  Fisher v United States, 18 BC Ind & Com LR 998, 1008 [emphasis added]). All three elements must be present for the Fifth Amendment's protection to be implicated.[6] The use of the subpoena power, of course, provides the requisite governmental coercion to make production of the tape compelled. And it must be assumed that the tape's content is self incriminatory. The question here is whether "testimonial evidence" is involved.
Testimonial evidence is that which communicates the witness' ideas or thoughts, that exposes the witness' mental state or thought process (see United States v Beattie, 541 F.2d 329, 331; Comment, No Fifth Amendment Privilege for Accountant-Prepared Tax Records in Attorney's Possession, 31 Ark L Rev 152, 155). Not only is immediate oral testimony covered, but also books and records (see People v Copicotto, 50 N.Y.2d 222, 228-229; United States v Beattie, supra; 8 Wigmore, Evidence [McNaughton rev, 1961], §§ 2263, 2264; Richardson, Evidence [10th ed  Prince], § 526, p 519; Fisch, New York Evidence [2d ed], § 691, p 390; Comment, 31 Ark L Rev 152, 155).[7]
*79 To assert successfully a claim of Fifth Amendment privilege with respect to the production of evidence, the evidence itself must be testimonial and the act of production also must include some testimonial quality (see Fisher v United States, 425 US 391, 409-411, supra; Note, 18 BC Ind & Com LR 998, 1009-1010).
In the present controversy, both the evidence sought and its production, if made by Dr. Rosen, are testimonial in nature. A tape cassette is clearly testimonial in that it is an aural record of the accused's communication; only live testimony could be any more personal. Moreover, production of the tape by Dr. Rosen would be testimonial by virtue of his authentication, express or implied, of the tape (see 8 Wigmore, § 2264, p 380). By producing Tape No. 2 in response to a subpoena, Dr. Rosen would not only express his belief that this is the tape sought by the Grand Jury, but would be vouching for the circumstances of its preparation, its accuracy, and the conclusions drawn from it. Thus, there is a testimonial element to the production of Tape No. 2 (cf. Fisher v United States, 425 US 391, 412-413, supra; 8 Wigmore, § 2264, p 380).
Although it is concluded that the Fifth Amendment protection is available, this conclusion is grounded on the assumption that Dr. Rosen gave the tape to Rosner. That is a factual question that appears not to have been determined below. For Dr. Rosen's Fifth Amendment rights to be protected by Rosner through the attorney-client privilege, the tape must have come back into Dr. Rosen's actual or constructive possession (see United States v Beattie, 541 F.2d 329, 331, supra). Thus, a question remains whether Mrs. Rosen was acting as her husband's agent when she took the tape from Olick and transferred it to Rosner.[8] If so, the tape should be protected.

CONCLUSION
Under all the circumstances, Tape No. 1, prepared by Dr. Rosen for his wife, is completely protected by the *80 marital privilege. Arising out of and made in reliance on the confidence of the marital relation, the tape can be neither heard nor examined for deletions.
It is further held that, when the attorney-client privilege obtains, counsel cannot be compelled to deliver material that would be privileged in the client's hands. This does not mean that an attorney may serve as a repository for any incriminating evidence that might be held by the client, such as physical evidence of a crime (see Genson v United States, 534 F.2d 719, 727). But when, as here, the evidence sought is inherently testimonial and its delivery was for the purpose of seeking legal advice rather than merely concealing evidence, that evidence falls within the privilege.[9]
As noted, Dr. Rosen can assert his Fifth Amendment privilege only if Tape No. 2 came back into his actual or constructive possession. Consequently, there must be a hearing to ascertain the capacity in which Mrs. Rosen was acting when she regained the tape from Olick and delivered it to Rosner. If Mrs. Rosen is found to have been acting as her husband's agent, then Dr. Rosen's rights remain intact and Tape No. 2 is privileged.
Accordingly, the order of the Appellate Division should be modified, without costs, and the matter remitted to Supreme Court, Bronx County, for further proceedings in accordance with this opinion, and, as so modified, the order should be affirmed.
JASEN, J. (concurring in part and dissenting in part).
I concur in the majority's determination that Tape No. 1 is subject to the marital privilege and cannot be obtained by the Grand Jury either to evaluate its contents or condition. I cannot agree, however, that, on the record before us, it is proper to quash the Grand Jury's subpoena as to Tape No. 2. Therefore, I dissent from that portion of the majority's decision.
*81 The Appellate Division, after listening to Tape No. 1, found it to contain statements by Dr. Rosen which were "made in reliance on the marital relationship and would not have been made but for this relationship." (87 AD2d 528.) That court also found that the tape remained, despite being given to others for safekeeping or transfer, confidential.
The record indicates that the tape was marked for Mrs. Rosen and was left in the Rosen home where she would find it. There is no allegation that anyone discovered or handled it before she did. Before she forwarded it to attorney Olick, she sealed it in a package. I would agree that the record clearly supports the determination that this was a confidential communication made in the marital relationship. It is, thus, proper to protect that tape in all respects.
As to Tape No. 2, which was left by Dr. Rosen for his medical colleagues, I have no dispute with the majority's initial analysis that attorney Rosner cannot assert Dr. Rosen's Fifth Amendment rights. The law is clear that the Fifth Amendment is a personal right that cannot be asserted by third parties. (See, e.g., Couch v United States, 409 US 322; Fisher v United States, 425 US 391, 396-401.) Rosner, to whom the subpoena is directed, clearly has no Fifth Amendment claim of his own to raise since what he is being compelled to produce are not even arguably his private papers or self incriminating. Thus, except for the existence of the attorney-client privilege, Rosner could raise no Fifth Amendment claim. It is at this point that I differ with the majority's construction of the facts and the implications drawn therefrom.
Rosner asserts that the attorney-client privilege attaches because the tapes were given to him by Mrs. Rosen at her husband's direction and for the purpose of obtaining legal advice. But Rosner does not claim that he had ever listened to either of the tapes in order to dispense legal advice. Given this testimony, I can conclude only that the client disclosed nothing more than the existence of the tape to his attorney. Since the tape has been held at different *82 times by at least five persons other than Dr. Rosen, its existence can hardly be deemed confidential.
It is likewise improper to conclude, on the basis of this record, that the tape was given for legal advice. While attorney Rosner asserts that it was given to him for legal advice, he offers nothing in support of this assertion. It is difficult to envision what type of legal advice could be obtained by giving one's attorney a cassette tape which the attorney does not listen to.
The purpose of the attorney-client privilege is to "foster openness between counsel and client so that legal problems can be thoroughly and accurately analyzed (see 8 Wigmore, Evidence [McNaughton rev, 1961], § 2291)." (Majority opn, at p 76.) In this case, it would appear quite obvious that the tapes were given to the attorney not to allow a thorough analysis of the contents of the tapes in order to give counsel to the client's legal problems but, rather, an attempt to secure the tape from any investigation, including that of the Grand Jury. Indeed, the existence of this second tape was not even known to the investigators or the Grand Jury until Rosner appeared in opposition to the Grand Jury's subpoena of Tape No. 1.
This, of course, is not to say that any statements made by Dr. Rosen as to what was on the tape would not be privileged. Such communication, assuming it was done in confidence, would relate to Dr. Rosen's legal problems and be subject to the attorney-client privilege. But I cannot agree with invoking the attorney-client privilege when the attorney serves as nothing more than a repository for potentially incriminating evidence. It is not the purpose of the attorney-client privilege to thwart a criminal investigation and invoking it to preclude a Grand Jury from carrying out its constitutional responsibilities of investigating serious crimes is, in my opinion, improper.
Even if Rosner did support his claim to have given legal advice about the existence of the tape, I would still be troubled by whether or not this would amount to a confidential communication to his attorney. Unlike the facts surrounding Tape No. 1, the facts surrounding the making and handling of Tape No. 2 give no assurance that it has remained confidential. The contents of the tape were intended *83 for Dr. Rosen's medical colleagues and left on his desk at the hospital. There are no facts indicating that at the time Dr. Rosen left it on his desk, he intended the contents of the tape to remain confidential or that he took any precautionary steps to insure that no one would listen to it. Indeed, it appears that by leaving it plainly visible on his desk, he intended his medical colleagues to listen to it after his suicide. Mrs. Rosen, however, intervened by telephoning her husband's superior at the hospital, who upon discovering the cassette, returned it to her. It was at that point that Mrs. Rosen wrapped the cassette and gave it to attorney Olick, who held it until Dr. Rosen retained Rosner. Olick then returned the tape to Mrs. Rosen, who forwarded it to Rosner by giving it to his teen-aged son. Given these multiple conveyances and the initial manner in which the tape was left, I cannot agree with the majority's conclusion (at p 77) that "[w]hen Rosner finally received the tape, he received it with its contents undisclosed." Although it is possible that no one, as Rosner asserts, even listened to the tape, it is equally possible that any number of people, including the medical colleagues for whom it was intended, did listen to the tape.
The majority dismisses this problem by likening the cassette to a letter in a sealed envelope where those who convey it learn only of its existence while the contents remain private. I think a more appropriate analysis would be to a letter in an unsealed envelope. It is, of course, possible that no one among those passing the letter would look into the unsealed envelope and read its contents, but it is equally possible that any number of them would do so. Rosner had entered little into the record other than his own statement that his son told him he did not listen to the tape to support his contention that the tape remained confidential. Notably missing is any affidavit from the chief of surgery who initially recovered the tape from Dr. Rosen's desk at the hospital. Significantly, neither court below addressed this question.
Even were I to subscribe to the majority's opinion that the attorney-client privilege has been properly asserted, I would be compelled to disagree with their conclusion that *84 Tape No. 2 is protected by Dr. Rosen's Fifth Amendment rights.
The Fifth Amendment "protects a person only against being incriminated by his own compelled testimonial communications." (Fisher v United States, supra, at p 409.) Traditionally, this has been applied to protect a person's private papers which reflect "a private inner sanctum of individual feeling and thought." (Couch v United States, 409 US 322, 327, supra; Murphy v Waterfront Comm., 378 US 52, 55.) The theory being that private thoughts, although written down or otherwise recorded, remain privileged and the government may not obtain access to those thoughts merely because the person had recorded them.
It was thus natural to extend the Fifth Amendment privilege against being compelled to testify to cover one's private papers. (See Fisher v United States, supra, at p 420 [BRENNAN, J., concurring].) But just as logically, the Supreme Court has declined to extend the privilege to cover nonprivate records or information. (Bellis v United States, 417 US 85; Andresen v Maryland, 427 US 463.) By applying the Fifth Amendment to this tape recording, the majority assumes that it is a private recording of Dr. Rosen's thoughts. Since it was concededly intended for his medical colleagues, I do not believe this would qualify as a private record. In this regard, it is analogous to business records to which others have access; those are not privileged precisely because they are not private in nature, whether or not anyone has availed himself of the opportunity to review those records. (Bellis v United States, supra, at pp 91-97.)
Assuming the Fifth Amendment does apply, I believe that, on the record before us, it is not established that Tape No. 2 is either testimonial or incriminating. At best, this court is faced with divided factual findings by the courts below. But those courts' findings were addressed only as to whether or not the tape was relevant and material to the Grand Jury's investigation. It is unclear, on the basis of those factual findings, whether or not the tape is incriminating. I cannot, therefore, agree with the majority's statement that "it must be assumed that the tape's content is self incriminatory." (At p 78.)
*85 Nor can I agree with their statement that: "A tape cassette is clearly testimonial in that it is an aural record of the accused's communication". (At p 79.) This appears to assume that all cassette tapes are testimonial in nature. In light of the Supreme Court's repeated refusal to extend the definition of what is testimonial, I find such an assumption questionable. (See Fisher v United States, supra, at p 408, citing Schmerber v California, 384 US 757 [blood samples nontestimonial]; Gilbert v California, 388 US 263 [voice exemplars nontestimonial]; United States v Wade, 388 US 218 [handwriting exemplars nontestimonial]; Holt v United States, 218 US 245 [donning blouse worn by perpetrators nontestimonial]; Bellis v United States, supra [partnership records nontestimonial].) The pronouncement in Boyd v United States (116 US 616) that the Fifth Amendment privilege is extended to private papers must be, in view of these subsequent decisions, given a limited application. (Supreme Court, 1975 Term, Fifth Amendment Protection of Private Papers, 90 Harv L Rev 76.) Thus, I think it improper to assume without a hearing on this specific question that all tapes are, or that this tape is, testimonial. Just as the giving of a voice exemplar or the taking of a blood sample was found to not be sufficiently testimonial in nature to warrant Fifth Amendment protection, it may well be that when the contents of Tape No. 2 is reviewed, it would be found to be nontestimonial. A review to determine whether or not the tape is testimonial or incriminating can, of course, be conducted by the court, in camera.
Unless it was shown at such a hearing that the tape is testimonial and incriminating, the question of whether or not its production was compelled need not be reached. If, at the hearing, it was determined that the tapes were either nontestimonial or nonincriminating, the act of producing them, even subject to a subpoena, would not involve testimonial self incrimination. "In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the one performed when a chattel or document not authored by the producer is demanded." (Fisher v United States, supra, at p 410, n 11.) The only testimonial aspect would then be that *86 turning over the tape concedes its existence. Certainly, merely admitting the existence of a common cassette tape cannot be deemed self incriminating. Whether this would constitute compelling self incriminatory testimony when the tape was heard by the Grand Jury cannot be determined until the nature of the tape is ascertained.
Because I believe that the assumptions made by the majority are improper and are not supported by the record before us, I would agree with the majority at the Appellate Division that respondent has not sustained his burden and the Grand Jury is entitled to Tape No. 2.
It is a "well settled" rule of law "that every person owes a duty to give evidence before the Grand Jury when requested to do so." (Matter of Additional Jan. 1979 Grand Jury of Albany Supreme Ct. v Doe, 50 N.Y.2d 14, 20 [citations omitted].) That duty is, of course, subject to limitations such as those validly raised under the Fifth Amendment. But the person resisting the subpoena has the burden of establishing that the Grand Jury is not entitled to the evidence. Unless there is such a showing, the Grand Jury's subpoena is presumptively valid.
Given the multiple questions as to whether or not either the attorney-client privilege or the Fifth Amendment privilege applies, I do not believe that Rosner has met his burden to entitle him to quash the Grand Jury's subpoena. I would, therefore, affirm the Appellate Division as to Tape No. 2.
Order modified, without costs, and matter remitted to Supreme Court, Bronx County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[1] There is some question whether Olick was acting as Dr. Rosen's attorney or merely as a friend before Rosner was hired. If Olick did become Dr. Rosen's counsel, then issues of confidentiality stemming from the attorney-client relationship would arise (see discussion under "Tape No. 2" of this opinion). Under the analysis taken by this court, however, Olick's precise role is irrelevant and so it is assumed without deciding that Olick's status was that of friend, not counsel.
[2] Indeed, the fact of deletions, if any, would not be discovered except for an improper review of the privileged contents. To order further examination on the basis of an unwarranted reading of the material is an unacceptable bootstrapping.
[3] Petitioners assert this argument for Tape No. 1 as well. Inasmuch as that tape is wholly protected by the marital privilege, as discussed under "Tape No. 1", supra, it is not addressed in this portion of the opinion. The following discussion, however, is equally applicable to Tape No. 1.
[4] It is noted that the People have never asserted nor do they claim that any of the third parties through whose hands the tape passed have actually listened to the tape.
[5] The cassette tape recording should be likened to a letter in a sealed envelope. The fact of the letter's existence is known to all who handled it; but its contents remain private. Similarly, all those through whose hands the tape passed know of its existence, but Dr. Rosen's message, whatever it may be, remains private.
[6] It should be noted that, in the context of Fifth Amendment rights, inquiry concerning the confidentiality of the communication as such has no place. The privilege accorded is to protect against compulsory incrimination through one's own testimony or personal records (see Andresen v Maryland, 427 US 463, 470-471). It is not intended to protect private information per se (id., at p 477).

"Confidentiality" in a constitutional sense may be denominated "expectation of privacy". This, however, is a concept implicated in Fourth Amendment analysis and should not be raised in considering a claim of compelled self incrimination. As the Supreme Court noted in Andresen, the Fifth Amendment does not protect an individual's records from seizure under a search warrant, but it does protect against their production under a subpoena (id., at pp 473-474). Thus, whether there was a confidential disclosure is relevant only to an inquiry of the attorney-client relationship, not whether the Fifth Amendment protection attaches.
[7] Clearly, a magnetic recording of one's spoken words constitutes the putting of thoughts into speech as much as would writing the words on paper. A tape recording simply is not the same type of physical evidence as is a blood sample or handwriting exemplar (cf. United States v Wade, 388 US 218; Schmerber v California, 384 US 757). The holding in Bellis v United States (417 US 85) is inapposite here as Dr. Rosen prepared the tape in a personal capacity, not as the representative of some legally cognizable, independent entity.
[8] The attorney cannot be considered as the client's agent as this would bootstrap all such evidence into the attorney-client privilege. There is also a logical inconsistency in making one principal in the attorney-client relationship the agent of the other for the purposes of that relationship.
[9] Of course, nothing stated here is intended to shift the burden of establishing the privilege from the party asserting the privilege (see Bloodgood v Lynch, 293 N.Y. 308, 314).